IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ING BANK, fsb (d/b/a ING DIRECT), and<br>ING DIRECT BANCORP,<br><br>               Plaintiffs,<br><br>   v.<br><br><br>EVERBANK,<br>EVERBANK FINANACIAL CORP., and<br>STONE & WARD, INC. (d/b/a STONE WARD)<br><br>               Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-cv-154-GMS |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION TO ENLARGE BRIEFING SCHEDULE
TO PERMIT JURISDICTIONAL DISCOVERY**

Francis DiGiovanni (#3189)
Stanley C. Macel, III (#492)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, Delaware 19899-2207
(302) 658-9141

Of Counsel:

Jennifer Fraser
CONNOLLY BOVE LODGE & HUTZ LLP
1990 M Street, N.W., Suite 800
Washington, D.C.  20036
(202) 331-7111

Dated:  June 7, 2006

## TABLE OF CONTENTS

I.   Summary of Argument ................................................................................ 1

II.  Argument ................................................................................................... 1

   A.  ING DIRECT's Claim of Personal Jurisdiction
       Over Stone Ward Is Meritorious, Not "Clearly Frivolous" .................................... 1

   B.  ING DIRECT's Request for Jurisdictional Discovery and
       Enlargement of the Briefing Schedule Is Not Unduly Burdensome ..................... 5

III. Conclusion ................................................................................................. 8

TABLE OF AUTHORITIES

<u>Cases</u>                                                                                  Page(s)

*ADP Investor Communication Services v. In House Attorney Services,*
390 F. Supp. 2d 212 (E.D.N.Y. 2005) ...............................................................7

*Atlanta Gas Light Co. v. Semaphore Adver., Inc.,*
747 F. Supp. 715 (S.D. Ga. 1990)..................................................................6, 7

*Bragg v. Linden Research, Inc.*
  __F. Supp. 2d __, 2007 WL 1549013, *5 (E.D. Pa. May 30, 2007)................5

*Compagnie Des Bauxites de Guinee v. L'Union Atlantique, S.A.,*
723 F.R.D. 357 (3d Cir. 1983)........................................................................1

*Courtroom Television Network v. Focus Media Inc.,*
264 A.2d 361 (N.Y. App. Div. 1991) ..............................................................7

*Fishel v. BASF Group,*
175 F.R.D. 525 (S.D. Iowa 1997).................................................................5, 7

*Gehling v. St. George's Sch. of Med., Ltd.,*
773 F.2d 539 (3d Cir., 1985)..........................................................................4

*Giangola v. Walt Disney World Co.,*
753 F. Supp. 148, 155-56 (D.N.J. 1990).......................................................3, 4

*Hansen v. Neumuller GmbH,*
163 F.R.D. 471 (D. Del. 1995) .....................................................................1, 8

*Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,*
107 F.3d 1026 (3d Cir. 1997)..........................................................................1

*Mesalic v. Fiberfloat Corp.,*
897 F2d 696, 700 n. 10 (3d Cir. 1990)............................................................4

*Padcom, Inc. v. Netmotion Wireless, Inc.,*
2004 WL 1192641 (D. Del. May 24, 2004).....................................................6

*Parker v. Learn the Skills, Corp.,*
2006 WL 759693 (E.D. Pa. Mar. 23, 2006).....................................................2

*Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,*
819 F.2d 434 (3d Cir. 1987)............................................................................7

*Rich v. KIS Cal., Inc.,*
121 F.R.D. 254 (M.D. N.C. 1988) ................................................................................6, 7

*Telecordia Techs., Inc. v. Alcatel,*
2005 WL 1268061 (D. Del. May 27, 2005)......................................................................2

*Ticket Solutions Inc. v. Banks,*
2002 WL 989462 (D. Kan. May 6, 2002)..........................................................................6

*In re Vitamins Antitrust Litig.,*
120 F. Supp. 2d 45 (D.D.C. 2000) ....................................................................................7

*Wellness Publishing v. Barefoot*
128 Fed. Appx. 266, 270 (3rd. Cir. 2005).....................................................................3, 4

# I.  **SUMMARY OF ARGUMENT**

Plaintiffs ING Bank, fsb, and ING DIRECT Bancorp (collectively, "ING DIRECT"), urge that their Motion to Enlarge Briefing Schedule to Permit Jurisdictional Discovery be granted.  Plaintiffs can and will show that defendant Stone & Ward, Inc. ("Stone Ward") has contacts with Delaware such the Court has personal jurisdiction over Stone Ward.  Plaintiffs' claim is not clearly frivolous, and granting this motion for limited jurisdictional discovery will not unduly burden Stone Ward.

# II.  **ARGUMENT**

## A.    **ING DIRECT's Claim of Personal Jurisdiction Over Stone Ward Is Meritorious, Not "Clearly Frivolous"**

Stone Ward, in its Answering Brief, fails to overcome the presumption in favor of granting jurisdictional discovery that the Third Circuit and this Court give to plaintiffs. "Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Compagnie Des Bauxites de Guinee v. L'Union Atlantique, S.A.*, 723 F.2d 357, 362 (3d Cir. 1983); *see also Hansen v. Neumuller GmbH*, 163 F.R.D. 471, 474 (D. Del. 1995); *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) (holding the general rule is that jurisdictional discovery should be allowed unless the plaintiff's claim is "clearly frivolous").

Contrary to Stone Ward's allegations, ING DIRECT is able to allege with particularity contacts between Stone Ward and Delaware sufficient to allow jurisdictional discovery to proceed.  ING DIRECT has alleged more than the existence of Stone Ward's national clients; ING DIRECT has in fact identified specific contacts between Stone

Ward and Delaware, including Delaware clients.  The specific and general jurisdictional contacts are identified in ING DIRECT's Opening Brief at pages 6-9.

Unlike the case at hand, the rare cases where the court has denied jurisdictional discovery on the basis that the plaintiff's claim is "clearly frivolous" share the fact that the plaintiff did not identify *any* credible threshold minimum contacts.  *See Parker v. Learn the Skills, Corp.*, 2006 WL 759693, at *4 (E.D. Pa. Mar. 23, 2006) (the Eastern District of Pennsylvania denied a request for jurisdictional discovery where the plaintiff alleged jurisdiction over a defendant based on "the bare allegation that [the defendant] has 'contacts' with Pennsylvania") (Ex. A); *Telecordia Techs., Inc. v. Alcatel*, 2005 WL 1268061, at *9 (D. Del. May 27, 2005) (the Court denied a request for jurisdictional discovery where the plaintiff (1) failed to demonstrate any competent evidence of the court's jurisdiction over the defendant and (2) failed to assert that the court could exercise personal jurisdiction over the defendant based on the general jurisdiction subsection of the Delaware long-arm statute) (Ex. B).  Such is not the case here.

Before this Court can properly decide whether sufficient jurisdiction over Stone Ward exists, it should permit jurisdictional discovery.  Because personal jurisdiction is a threshold issue, courts have set a low bar to allow jurisdictional discovery—the "clearly frivolous" standard.  ING DIRECT has met and exceeded this low threshold by identifying known contacts between Stone Ward and Delaware sufficient to establish both specific and general jurisdiction.  *See* Opening Brief at pages 6-9.  Contrary to Stone Ward's assertion that ING DIRECT's jurisdictional allegations are "unsupported (Answering Br. at 5), ING DIRECT has set forth concrete evidence of jurisdiction that sufficiently meets the threshold of allowing jurisdictional discovery.

Stone Ward tries to downplay the effect of its internet advertising by arguing that "the level of interactivity of a website is pertinent solely to the assertion of personal jurisdiction over the owner of the website, not Stone Ward."  Answering Br. at 5.  Stone Ward does not support this proposition; indeed, it is unsupportable.  Stone Ward *creates* websites that *specifically target* consumers in Delaware.  This is in many ways more of a jurisdictional connection to the website *creator* than the website *owner*.  For example, it is Stone Ward that creates the "bait" that lures Delaware residents into the interactive and transactional web-based contacts with Stone Ward's customers (such as EverBank). Stone Ward creates this digital bait with the intent to lure residents from all states, including Delaware, to the EverBank website.  The advertisement recited in the Complaint in this case did exactly that:  lured consumers (some almost certainly from Delaware) to the advertisement, and then interactively directed the consumer to EverBank in Florida (and away from the ING DIRECT, of Delaware).  The Third Circuit has held that advertisements that induce action (such as the advertisement recited in the Complain in this case) are not "passive," but are interactive and thus result in personal jurisdiction over the creator:

> [T]he advertisement in this case induced viewers to establish direct contact with [the defendant] by calling its toll-free phone number to place orders.  This inducement destroys any semblance of the passive advertising addressed in *Giangola* [*v. Walt Disney World Co.*, 753 F. Supp. 148, 155-56 (D.N.J. 1990)], which expressly distinguished advertisements in the form of direct mail solicitations.  For purposes of jurisdictional analysis, an infomercial broadcast that generates telephone customers is the equivalent of an interactive web-site through which a defendant purposefully directs its commercial efforts towards residents of a forum state.

*Wellness Publishing v. Barefoot*, 128 Fed. Appx. 266, 270 (3rd Cir. 2005) (referenced as non-precedential) (Ex. C).  In *Barefoot*, a Lanham Act case, the Third Circuit found

jurisdiction over a group of defendants that *created infomercials* (among other things) for another group of defendants. *Id*. at 271. This is directly analogous to the instant case, where Stone Ward *created interactive banner advertisements* for EverBank.

Very recently (May 30, 2007), the Eastern District of Pennsylvania relied on the Third Circuit's decision in *Barefoot* to find personal jurisdiction over the person who creates a marketing campaign:

> *Barefoot*'s analysis applies to the facts of this case. First, Bragg has provided evidence that Rosedale helped orchestrate a campaign at the national level to induce persons, including Bragg, to purchase virtual land and property on Second Life. As part of the national campaign, Bragg made representations that were distributed nationally, including in Pennsylvania. Moreover, this case does not involve "injuries unrelated to the broadcast of the advertisement in the forum state," as was the case in *Gehling*[1] or *Giangola*. *Cf. Barefoot*, 128 Fed. Appx. at 270. Rather, Rosedale's representations constitute part of the alleged fraudulent and deceptive conduct at the heart of Bragg's claims in this case.
>
> Second, like the role of the infomericals in *Barefoot*, Rosedale's personal role was to "bait the hook" for potential customers to make more interactive contact with Linden by visiting Second Life's website. Rosedale's activity was designed to generate additional traffic inside Second Life. He was the hawker sitting outside Second Life's circus tent, singing the marvels of what was contained inside to entice customers to enter. Once inside Second Life, participants could view virtual property, read additional materials about purchasing virtual property, interact with other avatars who owned virtual property, and, ultimately, purchase virtual property themselves. Significantly, participants could even interact with Rosedale's avatar on Second Life during town hall meetings that he held on the topic of virtual property.
>
> Viewed in context, Rosedale's marketing efforts in this case are more "interactive" rather than "passive." *C.f. Barefoot*, 128 Fed. App'x at 270 (emphasizing that "interactive" contacts are more significant for jurisdictional purposes than "passive" contacts). Thus, they provide more than just "tangential" support for specific personal jurisdiction. *See Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 700 n.10 (3d Cir. 1990) (noting that a defendant's marketing strategy, including advertising in national

---

[1]*Gehling v. St. George's Sch. of Med.*, *Ltd*., 773 F.2d 539 (3d Cir. 1985).

> publications distributed in the forum, provided only "tangential" support
> for specific personal jurisdiction).

*Bragg v. Linden Research, Inc.*, __ F. Supp. 2d __, 2007 WL 1549013, *5 (E.D. Pa. May 30, 2007) (Ex. D).  The pertinence of this case is readily apparent, and directly refutes Stone Ward's arguments that the Court cannot maintain jurisdiction over it.

Moreover, contrary to Stone Ward's assertion, this Court's exercise of jurisdiction over Stone Ward does not contravene the principles of Due Process.  Through the contacts ING DIRECT has already identified, ING DIRECT has shown that Stone Ward purposefully availed itself of Delaware's laws and has continuous and systematic contacts with Delaware.  It is not unforeseeable that Stone Ward would be hauled into a Delaware Court.  *See supra* and Opening Brief at 6-9.  In addition to ING DIRECT's current evidence, it is important for ING DIRECT to receive jurisdictional discovery to learn the full extent and nature of Stone Ward's contacts with the State of Delaware.

**B.    ING DIRECT's Request for Jurisdictional Discovery and Enlargement of the Briefing Schedule is Not Unduly Burdensome**

Stone Ward alleges that allowing ING DIRECT to proceed with jurisdictional discovery would "unduly burden Stone Ward and delay resolution of Stone Ward's motion to dismiss without justification."  Answering Brief at 5.  Because the proposed requests are narrowly tailored to issues pertaining to personal jurisdiction and can be answered by Stone Ward with minimal effort, Stone Ward will not be unduly burdened. *See Fishel v. BASF Group*, 175 F.R.D. 525, 528 (S.D. Iowa 1997) ("The Court will require responses to the extent the outstanding discovery is reasonably tailored to the jurisdictional issues and may be answered with reasonable effort.").  ING DIRECT's proposed document requests are limited to personal jurisdiction issues.  Included among

these issues are those enumerated in ING DIRECT's Brief to Enlarge, which focus on Stone Ward's contacts with Delaware with regard to their advertising, marketing, and promotional campaigns. Opening Brief at 10.

The information ING DIRECT seeks is relevant to assessing the extent of Stone Ward's contacts with Delaware. *See Padcom, Inc. v. Netmotion Wireless, Inc.*, 2004 WL 1192641 (D. Del. May 24, 2004) (considering a mix of internet and non-internet factors when determining whether it could exercise personal jurisdiction.) (Ex. E hereto); *Ticket Solutions Inc. v. Banks*, 2002 WL 989462 (D. Kan. May 6, 2002) (finding personal jurisdiction over an internet domain name holder when he solicited business from Kansas residents over the internet.) (Ex. F hereto); *Atlanta Gas Light Co. v. Semaphore Adver., Inc.*, 747 F. Supp. 715 (S.D. Ga. 1990) (holding that an advertising firm's placement of advertisements on Georgia television stations was controlling in the court's decision to exercise personal jurisdiction).

Stone Ward inaccurately claims that "[w]ere jurisdictional discovery granted, the information ING seeks would not serve to establish personal jurisdiction over Stone Ward . . . ." Answering Brief at 5. ING DIRECT has already identified facts sufficient to warrant jurisdiction under the Delaware long-arm statute and to satisfy constitutional due process requirements. *See supra* and Opening Br. at 6-9. The exercise of personal jurisdiction over Stone Ward is a threshold question as to ING DIRECT's ability to pursue claims against Stone Ward. Jurisdictional discovery will entitle ING DIRECT to present the Court with a complete picture of Stone Ward's contacts with Delaware. See *Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 257 (M.D.N.C. 1988) (holding that jurisdictional discovery is necessary before a plaintiff could respond to defendants' motion to dismiss).

Stone Ward attempts to distinguish cases where courts have maintained personal jurisdiction over advertising agencies. Answering Brief at 4. These cases were initially cited by ING DIRECT in its Motion to Enlarge to illustrate the importance of the fact that Stone Ward's contacts with Delaware are "central to the conduct of its business." *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 438 (3d Cir. 1987). The central part of Stone Ward's business is the advertising materials it creates for its clients. ING DIRECT seeks, through jurisdictional discovery, further evidence to enable it to fully and fairly establish that this Court may exercise personal jurisdiction over Stone Ward.[2]

Where requests are "highly relevant and crucial to the resolution of the jurisdictional questions pending before this Court," a claim of undue burden fails. *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 53 (D.D.C. 2000); *see also Rich*, 121 F.R.D. at 258 (holding that because the plaintiffs narrowed their discovery requests to ten interrogatories dealing strictly with the issue of personal jurisdiction, the information sought was not intrusive). Stone Ward would not suffer if jurisdictional discovery were permitted. Rather, the limited areas of inquiry sought in ING DIRECT's proposed discovery requests will be able to be "answered with reasonable effort." *Fishel,* 175 F.R.D. at 528. ING DIRECT's proposed discovery—limited to documents requests and a

---

[2] Stone Ward misses the point in its discussion of *ADP Investor Communication Services v. In House Attorney Services*, 390 F. Supp. 2d 212 (E.D.N.Y. 2005), *Courtroom Television Network v. Focus Media Inc.*, 264 A.2d 351 (N.Y. App. Div. 1991), and *Atlanta Gas Light Co. v. Semaphore Advertising, Inc.*, 747 F. Supp. 715 (S.D. Ga. 1990). The issue presently before this court is not whether the Court can exercise personal jurisdiction. Rather, the issue is whether jurisdictional discovery is permissible. These three cases cited by Stone Ward discuss whether dismissal is proper due to a lack of personal jurisdiction. That ultimate question will arise after ING DIRECT has had an opportunity to take jurisdictional discovery of Stone Ward, and the jurisdictional issue can be properly briefed.

single deposition—amount to an insignificant burden compared to the prejudice ING DIRECT would suffer by not discovering more information about Stone Ward's contacts with Delaware.

Under Federal Rule of Civil Procedure 26, liberal discovery is allowed of any relevant non-privileged facts, including "where the plaintiff seeks discovery to establish personal jurisdiction." *Hansen*, 163 F.R.D. at 473. This Court has stated that "[t]he rationale for this rule is that the plaintiff may be unable to ascertain the extent of the defendant's contacts with the forum state . . . unless some discovery is permitted." *Id.* at 473-74. To date, ING DIRECT has provided competent evidence of Stone Ward's contacts with Delaware, and thus is not engaged in a fishing expedition. As this Court has stated, "[w]hen the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license." *Hansen*, 163 F.R.D. at 474.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the Opening Brief, ING DIRECT's Motion to Enlarge Briefing Schedule to Permit Jurisdictional Discovery should be granted.

Dated: June 7, 2007          /s/ Francis DiGiovanni
                             Francis DiGiovanni (#3189)
                             Stanley C. Macel, III (#492)
                             CONNOLLY BOVE LODGE & HUTZ LLP
                             1007 North Orange Street
                             Wilmington, Delaware 19899-2207
                             (302) 658-9141

                             OF COUNSEL:

                             Jennifer Fraser
                             CONNOLLY BOVE LODGE & HUTZ LLP
                             1990 M Street, N.W., Suite 800
                             Washington, D.C.  20036
                             (202) 331-7111

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of June, 2007, the attached PLAINTIFFS'

REPLY BRIEF IN RESPONSE TO DEFENDANTS' ANSWERING BRIEF

OPPOSING PLAINTIFF'S MOTION TO ENLARGE BRIEFING SCHEDULE TO

PERMIT JURISDICTIONAL DISCOVERY was served upon the below-named counsel

of record at the address via hand delivery and e-mail:

> Julia Heaney
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347
>
> Richard D. Kirk
> Ashley B. Stitzer
> The Bayard Firm
> 222 Delaware Avenue, Suite 900
> P.O. Box 25130
> Wilmington, DE 19899-5130

 /s/ Francis DiGiovanni
Francis DiGiovanni (#3189)

9

# EXHIBIT
# A

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 2

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

H

Parker v. Learn the Skills Corp.
E.D.Pa.,2006.

United States District Court,E.D. Pennsylvania.
Gordon Roy PARKER, a/k/a Ray Gordon, d/b/a
Snodgrass Publishing Group
v.
LEARN THE SKILLS CORP., et al.
**No. Civ.A. 05-2752.**

March 23, 2006.

Gordon Roy Parker, Philadelphia, PA, pro se.
Matthew S. Wolf, Haddonfield, NJ, for Learn the
Skills Corp.
Thom E. Geiger, Columbus, MS, pro se.
Mary Kay Brown, Buchanan Ingersoll, Philadelphia,
PA, for Paul Ross also Known as Ross Jeffries.
Dennis G. Young, Jr., Montgomery McCracken
Walker & Rhoads, Phila, PA, for Trustees of
University of Pennsylvania.
Matthew S. Wolf, Haddonfield, NJ, pro se.

*MEMORANDUM*

BARTLE, J.

*1 Pro se plaintiff Gordon Roy Parker (" Parker" ),
who is no stranger to this court, brings this action
against defendants Trustees of the University of
Pennsylvania (" Penn" ), Learn the Skills Corporation
(" LTSC" ), Formhandle @Fastseduction.com ("
Formhandle" ),[FN1] Paul J. Ross, Matthew S. Wolf,
and Thomas E. Geiger. Plaintiff's amended complaint
alleges violations of the Racketeer Influenced and
Corrupt Organizations Act (" RICO" ), 18 U.S.C. §§
1961 et seq., the Sarbanes-Oxley Act, 18 U.S.C. §
1513(e), the Clayton Act, 15 U.S.C. § 12, the
Lanham Act, 15 U.S.C. § 1125(a), and common law
counts of civil conspiracy, tortious interference,
abuse of process, fraudulent misrepresentation, and
invasion of privacy.

> FN1. The amended complaint alleges that
> Formhandle is one of the owners of LTSC.
> Formhandle and LTSC are treated
> interchangeably in the amended complaint,
> so this Memorandum will refer only to
> LTSC in the interest of clarity.

Before the court are the separate motions of
defendants Ross, LTSC and Geiger made pursuant to
Rule 12(b)(2) of the Federal Rules of Civil
Procedures to dismiss for lack of personal jurisdiction
and of defendants Penn and Wolf pursuant to Rule
12(b)(6) for the failure to state a claim on which
relief may be granted. In addition, plaintiff has filed a
motion to conduct jurisdictional discovery against
Ross, LTSC and Geiger.

I.

For present purposes we assume plaintiff's allegations
to be true. Markowitz v. Northeast Land Co., 906
F.2d 100, 103 (3d Cir.1990). We note that the
amended complaint at issue before the court is far
from a model of clarity and in parts confusing, if not
incomprehensible. Moreover, it spans more than 75
pages and including over 100 footnotes. Though not
directly raised by defendants, the amended complaint
hardly complies with the " short and plain statement"
requirement under Rule 8(a) of the Federal Rules of
Civil Procedure.

Plaintiff alleges that defendants LTSC and Ross were
the principals in an association-in-fact, Internet-based
RICO enterprise. Defendants Geiger, Penn and Wolf
are alleged operatives in this enterprise. In addition,
the amended complaint alleges misconduct by at least
eight other individuals not named as defendants.

In brief summary, plaintiff alleges defendants ran this
operation, referred to as " the Seduction Mafia," with
the purpose of controlling the flow of revenue from
commerce relating to the " alt.seduction.fast" ("
ASF" ) USENET group.[FN2] ASF is allegedly a "
moderated" USENET group as opposed to an "
unmoderated" group. The amended complaint does
not define either of these terms. Plaintiff avers that
USENET groups are non-commercial in nature.

> FN2. While not explained in plaintiff's
> amended complaint, a USENET group is
> apparently an Internet-based, topical online
> discussion forum that loosely resembles an
> electronic bulletin board.

The topic of discussion on ASF is alleged to be
different types of " seduction" or " pick-up"
methods for men to use in attracting women. Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 3

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

and defendants Ross and LTSC are allegedly competitors in the profitable business of offering seduction self-help advice to these would-be Casanovas seeking help on the ASF USENET group. The gravamen of plaintiff's amended complaint appears to be that the Seduction Mafia has used the ASF discussion forum to promote the products of defendants Ross and LTSC to the financial gain of the Seduction Mafia, all while prohibiting plaintiff from posting messages about his own seduction theories and products on ASF. Plaintiff further alleges that defendants engaged in disparaging comments about plaintiff on the Internet serving to further cause him injury and deprive him of business. Plaintiff claims compensatory damages in excess of $2 billion, in addition to punitive damages and other injunctive relief.

**\*2** Plaintiff previously filed a suit similar to the instant action against defendants LTSC, Geiger, and Formhandle in *Parker v. Learn the Skills Corp.,* Civ. A. No. 03-6936 (hereinafter, " *Parker I*" ). In that action, the late Judge James McGirr Kelly granted pro se defendant Geiger's motion to dismiss plaintiff's first amended complaint without prejudice due to its failure to comply with the " short and plain statement" requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. *See Parker I,* Civ. A. No. 03-6936, 2004 WL 2384993 (E.D.Pa. Oct.25, 2004). The court later dismissed plaintiff's second amended complaint, again without prejudice, for failing to correct this same pleading deficiency. *See* Order of Dismissal, No. 03-6936 (E.D.Pa. Dec. 3, 2004).

## II.

We turn first to the separate motions of defendants Ross, LTSC and Geiger [FN3] to dismiss for lack of personal jurisdiction made pursuant to Rule 12(b)(2). The amended complaint seeks recovery against these three defendants under the RICO Act, 18 U.S.C. § 1961 *et seq.,* the Clayton Act, 15 U.S.C. § 12, the Lanham Act, 15 U.S.C. § 1125(a), as well as common law counts of civil conspiracy, tortious interference and invasion of privacy. Plaintiff asserts that jurisdiction is proper and has opposed each defendant's motion to dismiss. In the alternative, he has filed a motion to conduct jurisdictional discovery against all three defendants. Ross, LTSC and Geiger all oppose such discovery. It is agreed by the parties that neither Ross nor Geiger resides in Pennsylvania, and no information has been provided or alleged regarding the status of LTSC.

FN3. Pro se defendant Geiger alternatively moves to strike the amended complaint, or to dismiss for failure to state a claim upon which relief can be granted or improper venue, or for a change of venue.

First we must determine whether this court's assertion of personal jurisdiction over Ross, LTSC and Geiger is proper. Rule 4(e) of the Federal Rules of Civil Procedure allows a district court to " assert personal jurisdiction over a non-resident to the extent allowed by the law of the forum state." *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984). Pennsylvania has enacted an expansive " long-arm" statute. *See* 42 Pa. Cons.Stat. Ann. § 5322. In addition to enumerating examples of specific acts subjecting persons to the jurisdiction of Pennsylvania courts, the statute provides that a court may exercise personal jurisdiction over non-residents " to the fullest extent allowed under the Constitution of the United States." *Id.* § 5322(b); *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992). Thus, we may validly exercise jurisdiction over a non-resident defendant under Pennsylvania's long-arm statute if doing so is consistent with the Due Process Clause of the Fourteenth Amendment to the Constitution. *See id.* at 1221.

Therefore, we must determine whether the defendants' contacts with Pennsylvania are sufficient to support either general or specific jurisdiction. *Id.; Pennzoil Products Co. v. Colelli & Assoc., Inc.,* 149 F.3d 197, 200 (3d Cir.1998). A court may exercise either general or specific personal jurisdiction over a defendant. *Remick v. Manfredy,* 238 F.3d 248, 255 (3d Cir.2001). General jurisdiction applies when the cause of action does not arise out of and is not related to the defendant's contacts with the forum and requires that the defendants' contacts to the forum be " continuous and substantial." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987) (citations omitted).

**\*3** To make a finding of specific jurisdiction, however, our Court of Appeals has explained that we " appl[y] two standards, the first mandatory and the second discretionary." *Pennzoil,* 149 F.3d at 201. First, we must determine whether the defendant has sufficient minimum contacts with the forum " necessary for the defendant to have reasonably anticipate[d] being haled into court there" to litigate a " cause of action arising out of [the] defendant's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 4

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

forum-related activities." *Id.; Remick,* 238 F.3d at 255; *see also World-Wide Volkswagen Corp. v. World Wide Volkswagen,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The minimum contacts must have a basis in " some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Mesalic v. Fiberfloat Corp.,* 897 F.2d 696 (3d Cir.1990). If this court determines that the defendant has adequate contacts with the forum to satisfy the Constitution, we " may inquire whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Pennzoil,* 149 F.3d at 201.

Plaintiff concedes that general jurisdiction is inapplicable and that the appropriate inquiry here is whether defendants have " minimum contacts" with Pennsylvania sufficient for this court to exercise specific jurisdiction. Plaintiff asserts that jurisdiction over Ross, a resident of California, is proper because Ross has engaged in conduct " expressly targeted at Pennsylvania residents," including the marketing of his seduction materials, the publication of a mailing list, and certain undescribed telephone marketing. *See* Am. Compl. ¶ 12. Ross has submitted an affidavit denying any contacts with Pennsylvania. Plaintiff alleges jurisdiction over defendant LTSC by virtue of LTSC's " soliciting and receiving donations on its website from internet users all over the world, including in the Commonwealth of Pennsylvania." *Id.* ¶ 13. Finally, plaintiff simply alleges that jurisdiction over Geiger, a resident of Mississippi, is proper because his conduct " was expressly targeted at Pennsylvania residents or occurred in Pennsylvania." *Id.* ¶ 11.

Our Court of Appeals has made clear that where a defendant has raised a jurisdictional defense, the plaintiff bears the burden of establishing that either general or specific jurisdiction can be exercised. *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros. Inc.,* 983 F.2d 551, 554 (3d Cir.1993); *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66-67 n. 9 (3d Cir.1984). General averments in an unverified complaint or response without the support of " sworn affidavits or other competent evidence" are insufficient to establish jurisdictional facts. *Time Share Vacation Club,* 735 F.2d at 67 n. 9.

Plaintiff has attached no affidavit and presented the court with no competent evidence on which we could reasonably rely in order to base a finding of personal

jurisdiction. We are left with only the conclusory and extremely vague allegations of minimum contacts contained in the amended complaint and reasserted in plaintiff's memoranda of law. The amended complaint alludes only to the jurisdiction-conferring conduct of defendants Ross, LTSC and Geiger in highly generalized terms. In any event, in our circuit " at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." *Time Share Vacation Club,* 735 F.2d at 67 n. 9. To the extent plaintiff attempts to rely exclusively on the allegations contained in his amended complaint, he falls short of his burden of establishing that jurisdiction can be exercised.

*\*4* Alternatively, plaintiff moves to conduct jurisdictional discovery. The Court of Appeals has held that district courts " are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is ' clearly frivolous." ' *Toys ' R ' Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (citation omitted). Applying that standard, other courts in this district have denied jurisdictional discovery where the party that bears the burden of establishing jurisdiction failed to establish a " threshold prima facie showing" of personal jurisdiction. *See, e.g., Southern Seafood Co. v. Holt Cargo Systems, Inc.,* Civ. A. No. 96-5217, 1997 WL 539763 at \*8 (E.D.Pa. Aug.11, 1997); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n,* 846 F.Supp. 374, 378 (E.D.Pa.1994); *Karibjanian v. Thomas Jefferson Univ. Hosp.,* Civ. A. No. 89-1891, 1990 WL 6131 at \*1 (E.D. Pa. Jan 25, 1990). A plaintiff meets this threshold showing by offering " factual allegations that suggest ' with reasonable particularity' the possible existence of the requisite ' contacts between [the party] and the forum state." ' *Toys ' R ' Us,* 318 F.3d at 456 (citing *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992)). In addition, the general presumption in favor of discovery is reduced when the defendants in question are individuals as opposed to corporations. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997).

Looking at plaintiff's amended complaint, we cannot say the jurisdictional allegations suggest " with reasonable particularity" the possible existence of the requisite minimum contacts. Plaintiff alleges jurisdiction over defendant Geiger based on the bare allegation that Geiger has " contacts" with Pennsylvania. *See* Am. Compl. ¶ 11. Against Ross

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

and LTSC, plaintiff alleges generalized conduct that was " expressly targeted at Pennsylvania residents" or revenue that was earned from " internet users all over the world, including" Pennsylvania. *See id.* ¶¶ 12-13. These strike us as highly analogous to the " mere unsupported allegation that the defendant ' transacts' business' in an area" or the allegation that defendants " must have" engaged in jurisdiction-conferring conduct. *Mass. Sch. of Law,* 107 F.3d at 1042, *aff'g* 846 F.Supp. at 378. In *Massachusetts School of Law,* the Court of Appeals affirmed the dismissal of 21 individuals on the basis of a lack of personal jurisdiction as well as the concurrent denial of jurisdictional discovery. 107 F.3d at 1042. The denial of discovery was appropriate due to the failure to " allege with particularity" any credible threshold minimum contacts. 846 F.Supp. at 378. Here, plaintiff has submitted no affidavit or otherwise competent evidence to lead us to believe his allegation of personal jurisdiction over defendants Ross, LTSC and Geiger is anything more than " clearly frivolous." Further, we are persuaded that it would be inappropriate to allow this serial litigant plaintiff " to conduct a fishing expedition to construct a basis for jurisdiction" and in the process to put Ross, LTSC and Geiger to any further expense. *Ames v. Whitman's Chocolates,* Civ. A. No. 91-3271, 1991 WL 281798, at *3 (E.D.Pa. Dec.30, 1991). Accordingly, we will deny the motion to conduct jurisdictional discovery and grant the separate motions of defendants Ross, LTSC and Geiger to dismiss for lack of personal jurisdiction.

### III.

*5 We turn next to the motions to dismiss pursuant to Rule 12(b)(6) by defendants Penn and Wolf. In considering a motion to dismiss for failure to state a claim, we accept as true all well-pleaded facts in the amended complaint and draw any reasonable inferences in plaintiff's favor. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). We should grant the motion only if " it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" contained in the amended complaint. *Id.*

Plaintiff asserts three counts against Wolf all arising from his role as counsel for LTSC in *Parker I:* participation in the RICO enterprise, civil conspiracy, and an abuse of process claim. According to plaintiff, Wolf allegedly participated in the RICO enterprise by

providing unauthorized legal services to the Seduction Mafia. These legal services consisted of Wolf's having moved to dismiss plaintiff's first amended complaint in *Parker I* in its entirety before Judge Kelly, rather than just against Wolf's client LTSC. Plaintiff alleges that defendant Wolf conspired along with plaintiffs Formhandle and LTSC in that action to " abuse process against plaintiff by agreeing to use Defendant Wolf's representation of LTSC as a vehicle for improperly and illegally moving this court to dismiss claims against the other defendants" in *Parker I. See* Am. Compl. ¶ 187. Wolf moves pursuant to Rule 12(b)(6) to dismiss all three counts against him on several grounds, including immunity for his actions.

Plaintiff's causes of action for civil conspiracy and abuse of process are governed by Pennsylvania law. Attorneys-at-law in the Commonwealth may assert judicial privilege or, as it is often called, " judicial immunity," as an affirmative defense to alleged torts that occur in connection with a judicial proceeding. *Panitz v. Behrend,* 429 Pa.Super. 273, 632 A.2d 562, 564 (Pa.Super.Ct.1993). This immunity covers all " communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 353 (1986). " [I]f the challenged conduct occurs outside the scope of representation, no reason for immunity exists." *Heffernan v. Hunter,* 189 F.3d 405, 413 (3d Cir.1999).

Plaintiff's core contention against Wolf is that he was acting outside the scope of his representation of LTSC in *Parker I* when he moved to dismiss plaintiff's first amended complaint in its entirety before Judge Kelly. We disagree. The motion was clearly filed " in the regular course of judicial proceedings." *Post,* 507 A.2d at 353. Further, we are persuaded that it was " pertinent and material to the redress or relief sought" when Wolf advocated that the entire amended complaint filed by plaintiff was meritless in *Parker I. Id.* Plaintiff cites no case where any court has found such basic attorney advocacy " outside the scope of representation." In any event, we see no cognizable harm to plaintiff resulting from such advocacy since Judge Kelly simply dismissed the amended complaint pursuant to Rule 8(a) of the Federal Rules of Civil Procedure and denied as moot the motion in question filed by Wolf. We conclude attorney Wolf is entitled to " judicial immunity" for filing the motion to dismiss in *Parker I.* Thus, we will grant the motion of Wolf to dismiss the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

conspiracy and abuse of process counts.

*6 We find that plaintiff's RICO claims against Wolf, alleging separate violations of 18 U.S.C. §§ 1962(a), (b), (c) and (d), must likewise fail. Plaintiff alleges that Wolf participated in the RICO enterprise by providing " illegal legal services" to the Seduction Mafia. See Am. Compl. ¶¶ 151-56. Again, these alleged " services" consisted solely of Wolf's arguing on behalf of LTSC that plaintiff's amended complaint in *Parker I* should be dismissed in its entirety. Again, Judge Kelly dismissed the motion filed by Wolf as moot when he granted Geiger's motion to dismiss pursuant to Rule 8(a) in *Parker I*. See *Parker I*, Civ. A. No. 03-6936, 2004 WL 2384993 at ¶ 5 (E.D.Pa. Oct.25, 2004). The United States Supreme Court has explained that a RICO " plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The allegedly " illegal legal services" consisting solely of a motion filed by Wolf and dismissed as moot by Judge Kelly does not constitute a cognizable injury to plaintiff's " business or property" arising from Wolf's conduct. In addition, the amended complaint fails to allege the required " pattern of racketeering activity" in that there is only one alleged act of possible misconduct by Wolf. *Id.* at 495. For these reasons, the RICO claims against defendant Wolf must also be dismissed.

Finally, we turn to Penn's motion to dismiss the counts brought against it. The amended complaint asserts three counts against Penn: a RICO violation under 18 U.S.C. § 1962(c) and (d), as well as state law claims for civil conspiracy and fraudulent misrepresentation. These claims arise from one primary relevant allegation: that a Penn employee, Detective James B. Blackmore, committed perjury in testifying before Judge Kelly on February 12, 2003 that he did not know the identity of a particular Seduction Mafia operative known as " Wintermute." Neither Detective Blackmore nor Wintermute is named as a defendant in the amended complaint.

Penn moves to dismiss the counts brought against it on several alternative grounds. First, Penn contends that the conspiracy and fraud counts must be dismissed as time-barred by the applicable statute of limitations. Pennsylvania has a two-year statute of limitations for claims for fraud. See *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 831 (Pa.Super.Ct.2005); 42 Pa. Cons.Stat. Ann. §

5524(7). In addition, a cause of action for civil conspiracy adopts the statute of limitations of the overt act committed in furtherance of the conspiracy. See *Chappele v. Chase*, 487 F.Supp. 843, 846 (E.D.Pa.1980). Here, the overt act in question is fraud, so the statute of limitations for the conspiracy count is also two years. See Am. Compl. ¶ 187. Because the complaint in this action was not initially filed until June 9, 2005, more than two years after Detective Blackmore testified on February 12, 2003, Penn contends both the conspiracy and fraud counts are time-barred. To the extent that the amended complaint seeks recovery for allegedly fraudulent misrepresentations made more than two years prior to the filing of his complaint, we agree. See *id.* ¶¶ 98, 99, 111, 187, 239. All allegations based on conduct prior to two years before the complaint was filed are untimely and cannot serve as a basis for recovery for either fraud or conspiracy.

*7 Penn further contends that, to the extent the amended complaint alleges fraudulent conduct that is not time-barred, the fraud count must be dismissed for failing to satisfy the pleading requirements for fraudulent representation pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. To satisfy the " particularity" requirement for pleading an " averment of fraud," the plaintiff must plead with particularity the " circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984). While the plaintiff need not plead the " date, place or time" of the fraud, he must at least use " precision and some measure of substantiation" in his allegations of fraud. *Id.*

Here, the amended complaint states only that " During the times in controversy, Defendant [Penn] has made several deliberately misleading representations to Plaintiff, whereby it feigned ignorance regarding Wintermute's identity, for the express purposes of obstructing justice, protecting a student and future potential contributing alumni, and obtaining goodwill by sending a message to incoming students that they ' have their back." ' Am. Compl. ¶ 239. Plaintiff fails to disclose the substance of these misrepresentations and offers nothing more to substantiate the allegation that Penn was acting for the express purpose of " obstructing justice." Furthermore, plaintiff fails to plead with the necessary specificity any detrimental reliance on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

**(Cite as: Not Reported in F.Supp.2d)**

representations made by Penn. Such vague and conclusory allegations of fraudulent conduct cannot satisfy the requirements of Rule 9(b). The fraudulent misrepresentation count therefore must be dismissed.

Second, we find that plaintiff has failed properly to plead a conspiracy charge. In Pennsylvania, " to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir.2003). This " combination" requires that " two or more persons combine or enter an agreement" to commit the unlawful act. *Burnside v. Abbott Labs. ..,* 351 Pa.Super. 264, 505 A.2d 973, 980 (Pa.Super.Ct.1985). There is no allegation in the amended complaint that Penn or its employee Detective Blackmore entered into any agreement with this so-called " Wintermute" to undertake the allegedly fraudulent misrepresentations. Instead, plaintiff claims only that Penn and Blackmore knew of Wintermute's identity and did not disclose it to him. Even assuming this is true, without more it is insufficient to maintain a claim of conspiracy against Penn absent an agreement to withhold the information. In Pennsylvania, an " agents of a single entity cannot conspire among themselves" or with their employer. *Rutherford v. Presbyterian-Univ. Hosp.,* 417 Pa.Super. 316, 612 A.2d 500, 508-09 (Pa.Super.Ct.1992); *see also Ne. Jet Ctr., Ltd. v. Lehigh-Northampton Airport Auth.,* 767 F.Supp. 672, 684-85 (E.D.Pa.1991). The conspiracy count against Penn must be dismissed.

**\*8** Finally, Penn contends that the amended complaint fails properly to plead a cognizable predicate act in support of plaintiff's RICO claim. The Supreme Court has held that a complaint must allege a defendant participated through " a pattern of racketeering activity," i.e., through the commission of at least two racketeering acts. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). The amended complaint alleges that Penn committed predicate acts by refusing to identify Wintermute and disclaiming knowledge of his identity at three separate times. *See* Am. Compl. ¶ 165. The amended complaint contains no allegation that this conduct " amount[s] to or pose[s] a threat of continued criminal activity." *See H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

Moreover, even assuming that the so-called predicate acts occurred, none of them is covered by the definition of " racketeering activity" in 18 U.S.C. § 1961(1). In addition, plaintiff has not alleged he has suffered an injury to his business or property sufficient to confer standing against Penn. The RICO claims against Penn must therefore be dismissed as well.

*ORDER*

AND NOW, this 23rd day of March, 2006, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of defendant Paul J. Ross to dismiss for lack of personal jurisdiction is GRANTED;

(2) the motion of defendant Learn the Skills Corporation to dismiss for lack of personal jurisdiction is GRANTED;

(3) the motion of defendant Thomas E. Geiger to dismiss for lack of personal jurisdiction is GRANTED;

(4) the motion of defendant Matthew S. Wolf to dismiss for failure to state a claim upon which relief may be granted is GRANTED;

(5) the motion defendant Trustees of the University of Pennsylvania to dismiss for failure to state a claim upon which relief may be granted is GRANTED; and

(6) the motion of plaintiff Gordon Roy Parker to conduct jurisdictional discovery against defendants Ross, Learn the Skills Corporation and Geiger is DENIED.

E.D.Pa.,2006.
Parker v. Learn the Skills Corp.
Not Reported in F.Supp.2d, 2006 WL 759693 (E.D.Pa.), RICO Bus.Disp.Guide 11,070

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# B

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

C

Telcordia Technologies, Inc. v. Alcatel S.A.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
**No. Civ.A. 04-874 GMS.**

May 27, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes,
Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Kevin M. Baird, Connolly Bove Lodge &
Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

### I. INTRODUCTION

*\*1* On July 16, 2004, the plaintiff, Telcordia
Technologies, Inc. (" Telcordia" ), filed this patent
infringement action against Alcatel S.A. (" Alcatel
S.A." ) and Alcatel USA, Inc. (" Alcatel USA" ).
Presently before the court is Alcatel S.A.'s motion to
dismiss for lack of personal jurisdiction. For the
following reasons, the court will grant the motion.

### II. BACKGROUND

Alcatel S.A. is a French corporation with its principal
place of business in Paris, France. Alcatel S.A. is the
parent company of Alcatel USA, a Delaware
corporation with its principal place of business in
Plano, Texas. (D.I. 18 Ex. 2 ¶¶ 2-3.) It is a holding
company that does not manufacture, sell, advertise,
offer to sell, trade or import any goods or services in
the United States or anywhere in the world. (*Id.* ¶¶ 3-
5.) It does not maintain any offices or other facilities
in Delaware, or the United States. (*Id.* ¶ 7.) It neither
owns nor leases any real property in Delaware or the
United States, but it does own United States patents.
(*Id.* ¶ 8.) Alcatel S.A. does not maintain any bank
accounts in Delaware and has never contracted to
supply services or things in Delaware or the United
States. (*Id.* ¶¶ 9-10.)

Telcordia, a Delaware Corporation with its principal
place of business in Piscataway, New Jersey, is the
assignee and owner of the patent-in-suit, U.S. Patent
No. 4,893,306 (the " '306 patent" ).[FN1] The '306
patent relates to a method and apparatus for
multiplexing circuit and packet traffic. The patent
discloses a data transmission technique, or Dynamic
Time Division Multiplexing (" DTDM" ), that is
compatible with the digital circuit transmission
format, as well as the packet transmission format,
thereby providing " a flexible migration strategy
between present circuit networks and future
broadband packet networks." (U.S. Patent No.
4,893,306 Abstract.) The complaint alleges that
Alcatel S.A. and Alcatel USA have infringed,
induced infringement of, and/or contributorily
infringed one or more claims of the '306 patent by
making, using, offering for sale, selling and/or
importing into the United States communication
network products embodying the patented invention.
(D.I. 1 ¶¶ 13-14.)

> FN1. The '306 patent was issued on January
> 9, 1990 and assigned to Bell
> Communications Research, Inc. (" Bellcore"
> ), which became Telcordia in 1999.

### III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack
of personal jurisdiction over the defendant. " Rule
12(b)(2) of the Federal Rules of Civil Procedure
requires a court to dismiss a case when the court
lacks personal jurisdiction over the defendant[ ]."
*E.I. DuPont de Nemours & Co. v. Rhodia Fiber &
Resin Intermediates,* 197 F.R.D. 112, 119
(D.Del.2000). In determining whether personal
jurisdiction exists, courts engage in a two step
analysis. First, the court must decide whether
jurisdiction is authorized by the long-arm statute of
the state in which the court sits. *Transportes Aeros de
Angola v. Ronair, Inc.,* 544 F.Supp. 864-65
(D.Del.1982). If jurisdiction is proper per the long-
arm statute, the court must then determine whether
exercising jurisdiction comports with the
requirements of the Due Process Clause of the
Fourteenth Amendment. *Id.* (noting, however, "
intent of the legislature to exercise jurisdiction over
non-residents whenever feasible" ); *Compaq*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

_Computer Corp. v. Packard Bell Elec., Inc._, 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of " minimum contacts" between the defendant and the forum state, " such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice." ' _International Shoe Co. v. Washington_, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. " purposefully avail[ed] itself of the privilege of conducting activities within the forum State." _Burger King Corp. v. Rudzewicz_, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting _Hanson v. Denckla_, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); _see also Asahi Metal Indus. Co. v. Superior Court_, 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. _Helicopteros Nacionales de Columbia, S.A. v. Hall_, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**\*2** In determining the jurisdictional question, the court must accept as true the allegations in the complaint. _Altech Indus., Inc. v. Al Tech Specialty Steel Corp._, 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a _prima facie_ showing of personal jurisdiction over Alcatel S.A. _ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc._, 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " ' establish with reasonable particularity" ' that jurisdiction over Alcatel S.A. exists. _Id._ (quoting _Joint Stock Soc'y v. Heublein, Inc._, 936 F.Supp. 177, 193 (D.Del.1996)).

IV. DISCUSSION

A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a

nonresident who " transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who " causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to " provide residents a means of redress against those not subject to personal service within the state." _Boone v. Oy Partek Ab_, 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a " nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. _See LaNuova D & B, S.p.A. v. Bowe Co._, 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. _Thorn EMI N. Am. Inc. v. Micron Tech., Inc._, 821 F.Supp. 272, 274 (D.Del.1993).

Telcordia asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency. [FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, " the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." _C.R. Bard Inc. v. Guidant Corp._, 997 F.Supp. 556, 559 (D.Del.1998) (citing _Mobil Oil Corp. v. Linear Films, Inc._, 718 F.Supp. 260, 266 (D.Del.1989)). Thus, the agency theory " examines the degree of control which the parent exercises over the subsidiary." _Applied Biosystems, Inc. v. Cruachem, Ltd._, 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) " the extent of overlap of officers and directors" ; (2) " methods of financing" ; (3) " the division of responsibility for day-to-day management" ; and (4) " the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." _Id._ If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 (" [A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its ' or through an agent' provision." )

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to " pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

**\*3** Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because " Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries-that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley (" Quigley" ) is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, " at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable

to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as " it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted) (noting that it is " well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do ' change hats' to represent the two corporations separately, despite their common ownership" ). As such, this factor does not weigh in favor of a finding of agency.

**\*4** Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F.Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA finances its day-to-day activities through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A.<u>FN3</u>

> <u>FN3.</u> The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

### B. <u>Federal Rule of Civil Procedure 4(k)(2)</u>

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to <u>Rule 4(k)(2)</u> of the Federal Rules of Civil Procedure. <u>Rule 4(k)(2)</u> provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

<u>Fed. R. Civ. P. 4(k)(2).</u> In order to establish jurisdiction pursuant to <u>Rule 4(k)(2), (1)</u> Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See* <u>BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 258-59 (3d Cir.2000).</u> Telcordia contends that all three requirements of <u>Rule 4(k)(2)</u> are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily infringed <u>the '306 patent.</u> Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, <u>28 U.S.C. § 1338</u> gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of <u>Rule 4(k)(2).</u>

**\*5** Having found that the first requirement of <u>Rule 4(k)(2)</u> is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See* <u>United States v. Offshore Marine Ltd., 179 F.R.D. 156, 160 (D.Vi.1998); Revak v. Locatum A.B., No. Civ. A. 03-4822, 2005 WL 1017771, at *2 (E.D.Pa. Apr.28, 2005).</u> As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." <u>Offshore Marine Ltd., 179 F.R.D. at 160.</u> Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See* <u>Base Metal Trading Ltd. v. OJSC " Novokuzetsky Aluminum Factory", 47 Fed. Appx. 73, 75 (3d Cir.2002)</u> (unpublished) (determining that negation issues need not be reached because the Due Process requirement of <u>Rule 4(k)(2)</u> was not satisfied). <u>FN4</u> Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See* <u>Offshore Marine Ltd., 179 F.R.D. at 160</u> (" Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state." ); *see also* <u>Commissariat A L'Energie Atomiquie v. Chi Mei Optoelectronics Corp., 293 F.Supp.2d 423, 430 (D.Del.2003),</u> *vacated on other grounds by* <u>395 F.3d 1315 (Fed.Cir.2005)</u> (issue abandoned on appeal) (" Plaintiffs must also demonstrate that defendant is ' not subject to the jurisdiction of *any* state' under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

Rule 4(k)(2). Therefore, Rule 4(k)(2) " provides ' a narrow exception which may subject an alien defendant to a federal court's jurisdiction." ' ) The court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be " significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

*\*6* Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that, in order to subject a defendant who is " not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party " ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend ' traditional notions of justice and fair play." ' *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has " minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident

defendant that has " purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that ' arise out of or related to' those activities." *Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are " continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, " [i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be " haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not " continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is " ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 7

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

*7 First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt (" ADR "), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) (" [T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule 4(k)(2) whenever a corporation lists its stock on a United States exchange." ). Likewise, " [o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D.Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F.Supp. at 1468. Additionally, " the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant ' purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys " R " Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States.[FN5]

> FN5. Telcordia asserts that there can be " no question that Alcatel S.A.'s website solicits

requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a " website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website " never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on " United States" as its country/region the web address changes from " www.alcatel.com" to " www.usa.alcatel.com." Further, when one clicks on the " About Alcatel" dropdown menu and selects " Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states " [i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a " continuous and systematic" presence in the United States.

*8 Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals*. As such, the court finds that there is no basis for exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

### C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. " is subject to personal jurisdiction under the *Delaware long-arm statute,"* it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the " limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making " a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it " strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is " arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it " is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should " exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

*9 " Although the plaintiff bears the burden of

demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is ' clearly frivolous.' ' *Toys " R " Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request " begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, " [t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, " a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, " a mere unsupported allegation that [a] defendant ' transacts business' in an area is ' clearly frivolous." ' *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) (" Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction." ). Rather, " there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, " [w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 9
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


*ORDER*

For the reasons stated in the court's Memorandum of
this same date, IT IS HEREBY ORDERED that:
1. Alcatel S.A.'s Motion to Dismiss for Lack of
Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is
DENIED.

D.Del.,2005.
Telcordia Technologies, Inc. v. Alcatel S.A.
Not Reported in F.Supp.2d, 2005 WL 1268061
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# C

Westlaw.

128 Fed.Appx. 266                                                          Page 2

128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))

**(Cite as: 128 Fed.Appx. 266)**

Wellness Publishing v. Barefoot
C.A.3 (N.J.),2005.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
    United States Court of Appeals,Third Circuit.
    WELLNESS PUBLISHING; Holt M.D. Consulting,
    Inc.; Nature's Benefit, Inc.; Stephen Holt, M.D.,
                        Appellants,
                             v.
    Robert R. BAREFOOT; Deonna Enterprises, Inc.;
    Hoph Marketing, Inc.; Scott Miller; Kevin Trudeau;
    Steven D. Ritchey; Allen Stern; Donald W. Barrett,
    Jr.; Traid Direct Response Marketing, Inc.; King
    Media, Inc.; Direct Marketing Concepts, Inc.; Shop-
    America, Inc.; Advanced Nutritional Innovations,
                            Inc.
                      **No. 03-3919.**

                  Argued Jan. 18, 2005.
                  Decided April 14, 2005.

**Background:** Seller and distributor of coral calcium
supplements and related promotional materials
brought action alleging breach of contract,
misappropriation of a copyrighted work, violations of
the Lanham Act, common law business torts, and
tortious interference with a contract. The United
States District Court for the District of New Jersey,
Joel A. Pisano, J., dismissed the case for lack of
personal jurisdiction. Seller appealed.

**Holdings:** The Court of Appeals held that:

(1) considerations of substantial justice did not
counsel against exercising personal jurisdiction over
foreign companies that produced infomercial and
processed telephone orders for calcium supplements
and books promoted in infomercial, but

(2) seller did not meet burden of pleading jurisdiction
facts with regard to foreign company that had no role
in the production or distribution of infomercials.

Affirmed in part, and reversed in part.

West Headnotes

**[1] Copyrights and Intellectual Property 99 ⟲ 79**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k79 k. Jurisdiction and Venue.
Most Cited Cases
Foreign company that produced and distributed an
infomercial and processed telephone orders for
calcium supplements and books promoted in
infomercial should have expected to be subject to
personal jurisdiction in New Jersey in action for
misappropriation of a copyrighted work, where
company advertised books to New Jersey customers,
answered phone when those customers called, and
then arranged to have the books shipped to New
Jersey addresses.

**[2] Federal Courts 170B ⟲ 81**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk77 Corporations, Actions by or
Against
                170Bk81 k. Sales, Solicitation and
Advertising. Most Cited Cases
    (Formerly 382k870(1) Trade Regulation)
It was both reasonable and fair for foreign company
that produced and distributed an infomercial and
processed telephone orders for calcium supplements
and books promoted in infomercial to appear in a
New Jersey court to answer charges of seller and
distributor of coral calcium supplements and related
promotional materials that company violated the
Lanham Act and common law prohibitions on false
advertising when it broadcast infomercial. Lanham
Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[3] Federal Courts 170B ⟲ 76.25**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "
Long-Arm" Jurisdiction in General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 266                                                                                         Page 3
128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))
**(Cite as: 128 Fed.Appx. 266)**

170Bk76.25 k. Tort Cases. Most Cited Cases
Effects of any intentional conduct by foreign company that produced and distributed an infomercial and processed telephone orders for calcium supplements and books promoted in infomercial designed to interfere with contractual relations necessarily would have been felt in New Jersey and, thus, company was subject to personal jurisdiction in New Jersey in action brought by seller and distributor of coral calcium supplements and related promotional materials for tortious interference with a contract.

**[4] Copyrights and Intellectual Property 99 🔑 79**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k79 k. Jurisdiction and Venue. Most Cited Cases
        (Formerly 382k870(1) Trade Regulation)

**Federal Courts 170B 🔑 76.25**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; " Long-Arm" Jurisdiction in General
                170Bk76.25 k. Tort Cases. Most Cited Cases
Considerations of substantial justice did not counsel against exercising personal jurisdiction in action brought by seller and distributor of coral calcium supplements and related promotional materials against foreign company that produced infomercial and processed telephone orders for calcium supplements and books promoted in infomercial for copyright infringement, false advertising, and tortious interference with a contract; infomercial resulted in approximately 6,856 sales to customers in New Jersey, totaling over $820,000 worth of merchandise, and New Jersey had substantial interest in protecting its general population from allegedly misleading advertising and also in vindicating seller's rights.

**[5] Copyrights and Intellectual Property 99 🔑 79**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k79 k. Jurisdiction and Venue. Most Cited Cases
        (Formerly 382k870(1) Trade Regulation)

**Federal Courts 170B 🔑 76.25**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; " Long-Arm" Jurisdiction in General
                170Bk76.25 k. Tort Cases. Most Cited Cases
Seller and distributor of coral calcium supplements and related promotional materials alleged sufficient facts to establish personal jurisdiction over foreign company that produced infomercial and processed telephone orders for calcium supplements and books promoted in infomercial on claims of copyright infringement, false advertising, and tortious interference with a contract; infomercial resulted in at least 22,352 orders from in-state customers representing approximately $1.14 million of merchandise.

**[6] Copyrights and Intellectual Property 99 🔑 82**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k82 k. Pleading. Most Cited Cases
        (Formerly 382k870(1) Trade Regulation)

**Federal Courts 170B 🔑 94**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk94 k. Pleading Venue. Most Cited Cases
Seller and distributor of coral calcium supplements and related promotional materials did not meet his burden of pleading facts supporting personal jurisdiction with reasonable particularity with regard to foreign company that had no role in the production

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

128 Fed.Appx. 266
128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))

**(Cite as: 128 Fed.Appx. 266)**

or distribution of infomercials that served as centerpiece of action for breach of contract, misappropriation of a copyrighted work, violations of the Lanham Act, common law business torts, and tortious interference with a contract.

On Appeal from the United States District Court for the District of New Jersey. (Dist. Court No. 02-3773(JAP)). District Court Judge: Honorable Joel A. Pisano.

Alan L. Zegas (Argued), Law Offices of Alan L. Zegas, Chatham, NJ, Keith N. Biebelberg, Biebelberg & Martin, Millburn, NJ, for Appellant.
Robert J. Gilson (Argued), Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, Daniel J. Hurtado (Argued), Jenner & Block LLP, Chicago, IL, David E. DeLorenzi, Timothy S. Susanin, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Appellees.

Before ALITO, MCKEE, and SMITH, Circuit Judges.

OPINION OF THE COURT
PER CURIAM.
**\*1** Stephen Holt and three companies associated with him, Wellness Publishing, Holt MD Consulting, Inc. and Nature's Benefit, Inc. (hereinafter " Holt" ), filed an action in the United States District Court for New Jersey against several defendants, alleging breach of contract, misappropriation of a copyrighted work, violations of the Lanham Act, common law business torts, and **\*268** tortious interference with a contract. All of these claims concern the advertising, sale, and distribution of coral calcium supplements and related promotional materials. The District Court dismissed the case for lack of personal jurisdiction. The plaintiffs then settled with defendants Robert Barefoot, Deonna Enterprises, Hoph Marketing, and Scott Miller, and the plaintiffs took the present appeal to contest the dismissal of their claims with respect to the remaining defendants. For the reasons stated below, we reverse the District Court's order with regard to two groups of defendants: (1) Kevin Trudeau and Shop America (hereinafter collectively " Shop America" ) and (2) Direct Marketing Concepts, Triad Direct Response Marketing, King Media, Steven Ritchey, Allen Stern, and Donald Barrett, Jr. (hereinafter collectively " DMC" ). However, we affirm the District Court's order with regard to Advanced Nutritional Innovations, Inc. Because we write only for the parties, we proceed directly to the substance of the jurisdictional issues.

**I.**

Contrary to the argument of the appellees, we have jurisdiction to consider the District Court's order of June 30, 2003, which dismissed the complaint for lack of personal jurisdiction, even though the notice of appeal states that the order being appealed is the District Court's order of August 27, 2003, which denied the plaintiffs' motion to amend the order of June 30, 2003. " We have appellate jurisdiction over orders not specified in the notice of appeal if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues." Williams v. Guzzardi, 875 F.2d 46, 49 (3d Cir.1989). Here, the requisite connection exists between the order dismissing the case and the order denying the motion to amend that order, and Holt's intention to appeal the dispositive order is apparent from the issues addressed in the brief. Finally, appellees have made no showing that they would be prejudiced by the exercise of appellate jurisdiction. Therefore, the plaintiffs' failure to specify the proper order in his notice of appeal was harmless error, and jurisdiction is proper. See United States v. Certain Land in the City of Paterson, 322 F.2d 866, 869-70 (3d Cir.1963).

**II.**

A plaintiff bears " the burden of demonstrating [that the defendants'] contacts with the forum state [are] sufficient to give the court in personam jurisdiction." Mesalic v. Fiberfloat Corp., 897 F.2d 696, 699 (3d Cir.1990). These contacts must be shown " with reasonable particularity." Mellon Bank v. Farino, 960 F.2d 1217, 1223 (3d Cir.1992). In considering a motion to dismiss on the basis of affidavits, a District Court must resolve all material factual disputes in favor of the plaintiffs. Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 368 (3d Cir.2002). Whether a given set of contacts is sufficient to create personal jurisdiction is a question of law, and therefore our review is plenary. Id. at 1221.

**\*2** Personal jurisdiction can be either general or specific.[FN1] Specific jurisdiction over a defendant can be established when the claim is related to or arises out of the defendant's forum-related activities such **\*269** that the defendant should reasonably anticipate being haled into court there. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85

128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))

**(Cite as: 128 Fed.Appx. 266)**

L.Ed.2d 528 (1985); *IMO Industries, Inc. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir.1998). Once minimum contacts are established, jurisdiction may be exercised when the court determines that to do so would comport with traditional notions of fair play and substantial justice. *Vetrotex,* 75 F.3d at 150-51.

> FN1. Given the limited scope of defendants' contacts with New Jersey an analysis of general jurisdiction is not necessary.

### III.

The District Court erred in its ruling that none of the defendants' contacts with New Jersey were related to plaintiffs' causes of action. The discussion below addresses the jurisdictional question with respect to the distinct groups of defendants remaining in the case.

### A.

The DMC defendant group is comprised of Steven Ritchey, Allen Stern, Donald Barrett, Triad Marketing, King Media, and Direct Marketing Concepts.[FN2] The affidavits and depositions submitted are sufficient to support Holt's claim that these corporations worked in concert to produce and distribute an infomercial and to process telephone orders for the calcium supplements and books promoted in that infomercial. Between January 2002 and September 2002, the infomercial resulted in approximately 6,856 sales to customers in New Jersey totaling over $820,000.00 worth of merchandise. (DMC Brief at 11.)

> FN2. Given the state of the record, on remand the District Court may address the question of whether the individual defendants Ritchey, Stern and Barrett are not subject to personal jurisdiction because the relevant contacts were established in their roles as corporate officers. *See Educational Testing Service v. Katzman,* 631 F.Supp. 550, 556-59 (D.N.J.1986).

[1] Holt claims that the promotion and distribution of the books *The Calcium Factor* and *Death by Diet* infringe on his copyright to the book *Barefoot on Coral Calcium.* These claims arise out of DMC's activity in New Jersey because DMC distributed the allegedly infringing books to New Jersey residents. There was nothing fortuitous about the presence of these books in New Jersey-DMC advertised the

books to New Jersey customers, answered the phone when those customers called, and then arranged to have the books shipped to New Jersey addresses.[FN3] The misappropriation claims are clearly related to the distribution of the infringing books, and because the books were knowingly sent to New Jersey by DMC, DMC should expect to be subject to jurisdiction in that state.

> FN3. The fact that the defendants forwarded processed orders to centers where the advertised product was packaged and shipped does not reduce the significance of DMC's essential role.

[2] Holt alleges that DMC violated the Lanham Act, 15 U.S.C. § 1125(a), and common law prohibitions on false advertising on the basis of statements made in *Coral Calcium I.* These claims are related to DMC's activity in New Jersey because the broadcasts which form the basis of the claims were viewed in New Jersey. It is true that an advertising campaign with national scope does not by itself give rise to general jurisdiction in a state where it is broadcast. *See, e.g., Gehling v. St. George's Sch. of Med., Ltd.,* 773 F.2d 539 (3d Cir.1985); *Giangola v. Walt Disney World Co.,* 753 F.Supp. 148 (D.N.J.1990). That principle is inapplicable to this case, however. First, those precedents involve **\*270** injuries unrelated to the broadcast of the advertisement in the forum state, and therefore are inapplicable to a specific-jurisdiction inquiry. A claim of false advertising, and the injury that results from false advertising, are inextricably related to the broadcast of the allegedly false advertisement. Second, the advertisement in this case induced viewers to establish direct contact with DMC by calling its toll-free phone number to place orders. This inducement destroys any semblance of the passive advertising addressed in *Giangola,* 753 F.Supp. at 155-56, which expressly distinguished advertisements in the form of direct mail solicitations. For purposes of jurisdictional analysis, an infomercial broadcast that generates telephone customers is the equivalent of an interactive web-site through which a defendant purposefully directs its commercial efforts towards residents of a forum state. *See Toys " R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 452 (discussing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997)). Under these circumstances, it is both reasonable and fair for the DMC defendants to appear in a New Jersey court to answer charges related to the broadcast of this infomercial.

128 Fed.Appx. 266                                                           Page 6

128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))

**(Cite as: 128 Fed.Appx. 266)**

**\*\*3** [3] Finally, Holt alleges that DMC tortiously interfered with a contract existing between Holt and Robert Barefoot by featuring Barefoot in the coral calcium infomercial and otherwise using Barefoot to promote their product. This claim calls for an application of the " effects" analysis set forth in _Calder v. Jones,_ 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); _Remick v. Manfredy,_ 238 F.3d 248, 260 (3d Cir.2001). In _Remick,_ this court held that because the beneficiary of a contract resided and worked in Pennsylvania, " the effects of any intentional conduct by the defendants designed to interfere with ... contractual relations ... necessarily would have been felt in Pennsylvania." _Remick,_ 238 F.3d at 260. Holt, as a resident of New Jersey, suffered the alleged injury resulting from DMC's intentional conduct in New Jersey. In this sense, although DMC's business strategy may not have targeted New Jersey, with regard to Holt's contract with Barefoot, DMC's alleged intentional interference was expressly aimed at the forum.

[4] Because the District Court determined that minimum contacts did not exist, no ruling was made on whether the exercise of personal jurisdiction over the DMC defendants would comport with substantial justice. It is apparent from the record, however, that considerations of substantial justice do not counsel against jurisdiction in this case. Although receipts from New Jersey customers were a small percentage of DMC's total business, those receipts were substantial in absolute terms and reflected the size of the state's economy relative to the national market. Furthermore, New Jersey has a substantial interest in protecting its general population from allegedly misleading advertising and also in vindicating Holt's rights.

### B.

[5] The Shop America defendant group is comprised of Shop America L.L.C. and Kevin Trudeau. Trudeau and Shop America worked in concert to produce a second infomercial featuring Robert Barefoot and to process telephone orders for the calcium supplements and books promoted in that infomercial. That infomercial resulted in at least 22,352 orders from New Jersey customers representing approximately $1.14 million of merchandise. (Shop America Brief at 011.)

Holt brings the same allegations of copyright infringement, false advertising and tortious interference against Shop America as he alleges against the DMC **\*271** defendants. While the contacts of Shop America are entirely distinct from the DMC group, and must be independently sufficient in order to support personal jurisdiction, the same legal analysis applies to both groups. Like DMC, however, Shop America distributed copies of _The Calcium Factor_ and _Death By Diet_ in New Jersey, used Robert Barefoot to promote their coral calcium product, produced an infomercial viewed in New Jersey and processed orders for merchandise from New Jersey customers. Because the nature and scope of Shop America's contacts with New Jersey, Dr. Holt, and the litigation at hand are substantially the same as those explored above relating to the DMC group, we hold that personal jurisdiction over the Shop America defendants is proper.

### C.

**\*\*4** [6] The District Court found no personal jurisdiction over Advanced Nutritional Innovations, Inc. (" ANI" ). Although Holt states in his complaint that ANI made false statements to some of Holt's New Jersey customers, this allegation does not serve as the basis of any claim made against ANI, nor was it the subject of discovery, nor did Holt otherwise substantiate this allegation before the District Court. ANI had no role in the production or distribution of the infomercials that serve as the centerpiece of this litigation, nor is there any connection between Robert Barefoot and ANI. With regard to this defendant, Holt did not meet his burden of pleading jurisdictional facts with reasonable particularity.

### IV.

For the above reasons, we affirm the order of the District Court with regard to Advanced Nutritional Innovations, Inc. and reverse with regard to Kevin Trudeau, Shop America, Direct Marketing Concepts, Triad Direct Response Marketing, King Media, Steven Ritchey, Allen Stern, and Donald Barrett.

C.A.3 (N.J.),2005.
Wellness Publishing v. Barefoot
128 Fed.Appx. 266, 2005 WL 852685 (C.A.3 (N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# D

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

Bragg v. Linden Research, Inc.
E.D.Pa.,2007.
Only the Westlaw citation is currently available.Marc
BRAGG, Plaintiff,
v.
LINDEN RESEARCH, INC. and Philip Rosedale,
Defendants.
**No. CIV.A.06 4925.**

May 30, 2007.

Jason A. Archinaco, Christopher Eric Ballod, White
& Williams LLP, Philadelphia, PA, for Plaintiff.
Andrew J. Soven, Reed Smith, LLP, Philadelphia,
PA, Scott D. Baker, Reed Smith LLP, San Francisco,
CA, for Defendants.

### MEMORANDUM

EDUARDO C. ROBRENO, J.

**\*1** This case is about virtual property maintained on a
virtual world on the Internet. Plaintiff, March Bragg,
Esq., claims an ownership interest in such virtual
property. Bragg contends that Defendants, the
operators of the virtual world, unlawfully confiscated
his virtual property and denied him access to their
virtual world. Ultimately at issue in this case are the
novel questions of what rights and obligations grow
out of the relationship between the owner and creator
of a virtual world and its resident-customers. While
the property and the world where it is found are "
virtual," the dispute is real.

Presently before the Court are Defendants' Motion to
Dismiss for Lack of Personal Jurisdiction (doc. no. 2)
and Motion to Compel Arbitration (doc. no. 3). For
the reasons set forth below, the motions will be
denied.

### I. BACKGROUND

#### A. *Second Life*

The defendants in this case, Linden Research Inc. ("
Linden" ) and its Chief Executive Officer, Philip
Rosedale, operate a multiplayer role-playing game set
in the virtual world [FN1] known as " Second Life." [FN2]
Participants create avatars [FN3] to represent
themselves, and Second Life is populated by
hundreds of thousands of avatars, whose interactions
with one another are limited only by the human

imagination.[FN4] According to Plaintiff, many people "
are now living large portions of their lives, forming
friendships with others, building and acquiring virtual
property, forming contracts, substantial business
relationships and forming social organizations" in
virtual worlds such as Second Life. Compl. ¶ 13.
Owning property in and having access to this virtual
world is, moreover, apparently important to the
plaintiff in this case.

#### B. *Recognition of Property Rights*

In November 2003, Linden announced that it would
recognize participants' full intellectual property
protection for the digital content they created or
otherwise owned in Second Life. As a result, Second
Life avatars may now buy, own, and sell virtual
goods ranging " from cars to homes to slot
machines." Compl. ¶ 7.[FN5] Most significantly for this
case, avatars may purchase " virtual land," make
improvements to that land, exclude other avatars
from entering onto the land, rent the land, or sell the
land to other avatars for a profit. Assertedly, by
recognizing virtual property rights, Linden would
distinguish itself from other virtual worlds available
on the Internet and thus increase participation in
Second Life.

Defendant Rosedale personally joined in efforts to
publicize Linden's recognition of rights to virtual
property. For example, in 2003, Rosedale stated in a
press release made available on Second Life's website
that:

Until now, any content created by users for persistent
state worlds, such as Everquest® or Star Wars
Galaxies ™, has essentially become the property of
the company developing and hosting the world.... We
believe our new policy recognizes the fact that
persistent world users are making significant
contributions to building these worlds and should be
able to both own the content they create and share in
the value that is created. The preservation of users'
property rights is a necessary step toward the
emergence of genuinely real online worlds.

**\*2** Press Release, Linden Lab, *Linden Lab Preserves
Real World Intellectual Property Rights of Users of
its Second Life Online Services* (Nov. 14, 2003).
After this initial announcement, Rosedale continued
to personally hype the ownership of virtual property

--- F.Supp.2d ----                                                    Page 3

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

on Second Life. In an interview in 2004, for example, Rosedale stated: " The idea of land ownership and the ease with which you can own land and do something with it ... is intoxicating.... Land ownership feels important and tangible. It's a real piece of the future." Michael Learmonth, *Virtual Real Estate Boom Draws Real Dollars,* USA Today, June 3, 2004. Rosedale recently gave an extended interview for Inc. magazine, where he appeared on the cover stating, " What you have in Second Life is real and it stays. It doesn't belong to us. You can make money." Michael Fitzgerald, *How Philip Rosedale Created Second Life,* Inc ., Feb. 2007.[FN6]

Rosedale even created his own avatar and held virtual town hall meetings on Second Life where he made representations about the purchase of virtual land. Bragg Decl. ¶ 68. Bragg " attended" such meetings and relied on the representations that Rosedale made therein. *Id.*

### C. *Plaintiffs' Participation in Second Life*

In 2005, Plaintiff Marc Bragg, Esq., signed up and paid Linden to participate in Second Life. Bragg claims that he was induced into " investing" in virtual land by representations made by Linden and Rosedale in press releases, interviews, and through the Second Life website. Bragg Decl. ¶¶ 4-10, 65-68. Bragg also paid Linden real money as " tax" on his land.[FN7] By April 2006, Bragg had not only purchased numerous parcels of land in his Second Life, he had also digitally crafted " fireworks" that he was able to sell to other avatars for a profit. Bragg also acquired other virtual items from other avatars.

The dispute ultimately at issue in this case arose on April 30, 2006, when Bragg acquired a parcel of virtual land named " Taessot" for $300. Linden sent Bragg an email advising him that Taessot had been improperly purchased through an " exploit." Linden took Taesot away. It then froze Bragg's account, effectively confiscating all of the virtual property and currency that he maintained on his account with Second Life.

Bragg brought suit against Linden and Rosedale in the Court of Common Pleas of Chester County, Pennsylvania, on October 3, 2006.[FN8] Linden and Rosedale removed the case to this Court (doc. no. 1) and then, within a week, moved to compel arbitration (doc. no. 3).

### II. MOTION TO DISMISS FOR LACK OF

### PERSONAL JURISDICTION

Defendant Philip Rosedale moves to dismiss all claims asserted against him for lack of personal jurisdiction.

#### A. *Legal Standards*

A federal district court may exercise jurisdiction to the same extent as the state in which it sits; a state, in turn, may exercise jurisdiction over a non-resident defendant pursuant to its so-called " long-arm statute." Because the reach of Pennsylvania's long-arm statute " is coextensive with the limits placed on the states by the federal Constitution," the Court looks to federal constitutional doctrine to determine whether personal jurisdiction exists over Rosedale. *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Products Co.,* 75 F.3d 147, 150 (3d Cir.1996); 42 Pa.C.S.A. § 5322(b).

**\*3** Personal jurisdiction can be established in two different ways: specific jurisdiction and general jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction is established when the basis of the " plaintiff's claim is related to or arises out of the defendant's contacts with the forum." *Pennzoil Products Co. v. Colelli & Assoc., Inc.,* 149 F.3d 197, 201 (3d Cir.1998) (citations omitted). General jurisdiction, on the other hand, does not require the defendant's contacts with the forum state to be related to the underlying cause of action, *Helicopteros,* 466 U.S. at 414, but the contacts must have been " continuous and systematic." *Id.* at 416.

Bragg does not contend that general jurisdiction exists over Rosedale. Rather, he maintains that Rosedale's representations support specific personal jurisdiction in this case.[FN9] The Court therefore need only address whether specific jurisdiction exists.

In deciding whether specific personal jurisdiction is appropriate, a court must first determine whether the defendant has the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there. *Pennzoil,* 149 F.3d at 201 (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Second, once minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional conceptions of fair play and substantial justice. *Id.* at

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

201 (citing _Burger King Corp. v. Rudzewicz,_ 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) and _Int'l Shoe Co. v. Washington,_ 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The first step is mandatory, but the second step is discretionary. _Id._

After a defendant has raised a jurisdictional defense, as Rosedale has in this case, the plaintiff bears the burden of coming forward with enough evidence to establish, with reasonable particularity, sufficient contacts between the defendant and the forum. _Provident Nat'l Bank v. Cal. Fed. Savings & Loan Assoc.,_ 819 F.2d 434, 437 (3d Cir.1987). " The plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.... [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." _Patterson by Patterson v. F.B.I.,_ 893 F.2d 595, 604 (3d Cir.1990). " Once the motion is made, plaintiff must respond with actual proofs not mere allegations." _Id._

### B. Application

In support of the Court's exercising personal jurisdiction over Rosedale, Bragg relies on various representations that Rosedale personally made in the media " to a national audience" regarding ownership of virtual property in Second Life. Bragg maintains that Rosedale made these representations to induce Second Life participants to purchase virtual property and that such representations in fact induced Bragg to do so. Bragg also relies on the fact that he " attended" town hall meetings hosted in Second Life where he listened to Rosedale make statements about the purchase of virtual land.

### 1. Minimum Contacts

\*4 The first question the Court must answer, then, is whether Rosedale has minimum contacts with Pennsylvania sufficient to support specific personal jurisdiction. The Court holds that Rosedale's representations-which were made as part of a national campaign to induce persons, including Bragg, to visit Second Life and purchase virtual property-constitute sufficient contacts to exercise specific personal jurisdiction over Rosedale.

_Wellness Publishing v. Barefoot_ provides useful guidance, albeit in a non-precedential opinion. 128

Fed. App'x 266 (3d Cir.2005). In that case, the Third Circuit recognized that an advertising campaign of national scope could not, on its own, provide the basis for _general jurisdiction_ in any state where advertisements were aired, but that under the appropriate circumstances, such contacts could provide the basis of exercising _specific jurisdiction_ over a defendant in a particular state where the advertisements were aired. _Id._ [FN10]

In _Barefoot,_ a group of defendants produced infomercials for calcium supplements and related products that ran nationally, including in New Jersey. _Id._ at 269. The defendants also processed telephone orders for products promoted in the infomercials. _Id._ The District Court dismissed the plaintiff's case for lack of personal jurisdiction in New Jersey. _Id._ at 270. On appeal, however, the Third Circuit reversed, holding that specific personal jurisdiction existed over the defendants that ran the infomercials in New Jersey. _Id._ In doing so, it analogized the defendants' promotional activities to the maintenance of a website. _Id._ (citing _Toys " R" Us, Inc. v. Step Two, S.A.,_ 318 F.3d 446, 452 (3d Cir.2003)).

Under the Third Circuit's jurisdictional analysis of websites, if a defendant website operator intentionally targets the site to the forum state and/or knowingly conducts business with forum state residents via the site, then the " purposeful availment" requirement is satisfied. _Toys " R" Us,_ 318 F.3d at 452. In addition, a court may consider the level of **interactivity** of the **website** and the defendant's related non-Internet activities as part of the " purposeful availment" calculus. _Id._ at 453.

The Third Circuit applied this same jurisdictional analysis in _Barefoot_ to hold that the defendants who ran the infomercials in New Jersey could be subject to **personal jurisdiction** in that state. 128 Fed. App'x at 270. First, it reasoned that, as with the mere operation of a website, " an **advertising** campaign with national scope does not by itself give rise to general jurisdiction in a state where it is broadcast." _Id._ That principle was inapplicable, however, because it involved precedents where the plaintiff's injuries were unrelated to the broad case of the advertisement in the forum state, which were therefore inapplicable to a specific-jurisdiction inquiry. Id. (citing _Gehling v. St. George's Sch. of Med., Ltd.,_ 773 F.2d 539 (3d Cir.1985); _Giangola v. Walt Disney World Co.,_ 753 F.Supp. 148 (D.N.J.1990)). Second, and most important for this case, the Third Circuit reasoned: \*5 [T]he advertisement in this case induced viewers

--- F.Supp.2d ---
--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

(Cite as: --- F.Supp.2d ----)

Page 5

to establish direct contact with [the defendant] by calling its toll-free phone number to place orders. This inducement destroys any semblance of the passive advertising addressed in *Giangola*. 753 F.Supp. at 155-56, which expressly distinguished advertisements in the form of direct mail solicitations. For purposes of jurisdictional analysis, an infomercial broadcast that generates telephone customers is the equivalent of an interactive web-site through which a defendant purposefully directs its commercial efforts towards residents of a forum state.

*Id.* at 270 (some internal citations omitted).

*Barefoot* 's analysis applies to the facts of this case. First, Bragg has provided evidence that Rosedale helped orchestrate a campaign at the national level to induce persons, including Bragg, to purchase virtual land and property on Second Life. As part of the national campaign, Bragg made representations that were distributed nationally, including in Pennsylvania. Moreover, this case does not involve " injuries unrelated to the broadcast of the advertisement in the forum state," as was the case in *Gehling* or *Giangola*.[FN11] Cf. *Barefoot*, 128 Fed. App'x at 270. Rather, Rosedale's representations constitute part of the alleged fraudulent and deceptive conduct at the heart of Bragg's claims in this case.

Second, like the role of the infomericals in *Barefoot*, Rosedale's personal role was to " bait the hook" for potential customers to make more interactive contact with Linden by visiting Second Life's website. Rosedale's activity was designed to generate additional traffic inside Second Life. He was the hawker sitting outside Second Life's circus tent, singing the marvels of what was contained inside to entice customers to enter. Once inside Second Life, participants could view virtual property, read additional materials about purchasing virtual property, interact with other avatars who owned virtual property, and, ultimately, purchase virtual property themselves. Significantly, participants could even interact with Rosedale's avatar on Second Life during town hall meetings that he held on the topic of virtual property.

Viewed in context, Rosedale's marketing efforts in this case are more " interactive" rather than " passive." *C.f.* *Barefoot*, 128 Fed. App'x at 270 (emphasizing that " interactive" contacts are more significant for jurisdictional purposes than " passive" contacts). Thus, they provide more than just "

tangential" support for specific personal jurisdiction. *See Mesalic v. Fiberfloat Corp.* .. 897 F.2d 696, 700 n. 10 (3d Cir.1990) (noting that a defendant's marketing strategy, including advertising in national publications distributed in the forum, provided only " tangential" support for specific personal jurisdiction).[FN12]

The Court's decision is also consistent with the decisions of courts in other jurisdictions which have extended specific jurisdiction over defendants who have made representations in national media when the dispute arose directly from those representations. *See, e.g., Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir.1994) (holding that national television broadcast into the forum state was sufficient for jurisdiction); *Caddy Prods., Inc. v. Greystone Int'l., Inc.*, No. 05-301, 2005 U.S. Dist. LEXIS 34467, *4-5 (D.Minn.2005) (holding that the defendant had sufficient contacts to support the exercise of specific personal jurisdiction, which included the defendant's marketing efforts, such as attending a national trade show and advertising in a national trade publication, coupled with defendant's shipment of the product into the forum state); *Hollar v. Philip Morris Inc.*, 43 F.Supp.2d 794, 802-03 (N.D.Ohio 1998) (holding specific personal jurisdiction existed over tobacco company that made false representations regarding smoking to a national audience, which induced plaintiffs to continue smoking; it is " axiomatic that what is distributed and broadcast nationwide will be seen and heard in all states." ) (internal quotation omitted); *Thomas Jackson Publ'g Inc. v. Buckner*, 625 F.Supp. 1044, 1046 (D.Neb.1985) (holding that performance of songs and interviews on national television supported finding of specific personal jurisdiction over a defendant whose songs infringed the plaintiff's copyright).

*6 Rosedale relies heavily on cases from other jurisdictions for the proposition that his statements do not subject him to personal jurisdiction in Pennsylvania because none of the statements were targeted directly at Pennsylvania as opposed to the nation at large. *See* Dfts.' Reply at 3. Rosedale's first cited case, however, involves representations specifically targeted at one state, as opposed to a national audience, that merely could be accessed worldwide because they were available on the Internet. *See Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir.2002) (" [T]he fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

(Cite as: --- F.Supp.2d ----)

Page 6

that the newspapers were intentionally directing their website content to a Virginia audience. Something more than posting and accessibility is needed to indicate that the newspapers purposefully (albeit electronically) directed their activity in a substantial way to the forum state..." ). Rosedale did not target his representations at any particular state, but rather to the nation at large. The other two cases cited by Rosedale are also distinguishable, because they involved isolated statements that were not, as is the case here, an integral part of a larger publicity campaign of national scope. *See Revel v. Lidov,* 317 F.3d 467, 475 (5th Cir.2002) (finding that the court lacked personal jurisdiction over author of an Internet bulletin board posting " because the post to the bulletin board was presumably directed at the entire world" and was not " directed specifically at Texas" ); *Griffis v. Luban,* 646 N.W.2d 527, 536 (Minn.2002) (" The mere fact that [the defendant], who posted allegedly defamatory statements about the plaintiff on the Internet, knew that [the plaintiff] resided and worked in Alabama is not sufficient to extend personal jurisdiction over [the defendant] in Alabama, because that knowledge does not demonstrate targeting of Alabama as the focal point of the ... statements." ). *See also Growden v. Ed Bowlin & Assoc., Inc.,* 733 F.2d 1149, 1151-52 & n. 4 (5th Cir.1984) (holding no personal jurisdiction existed based on ads in two national publications for the sale of an airplane, the crash of which was the subject of the litigation).

Accordingly, the Court finds that Rosedale has minimum contacts with Pennsylvania sufficient to support specific personal jurisdiction.

### 2. *Fair Play and Substantial Justice*

The Court also finds that the exercise of personal jurisdiction in this case would not offend due process. *See Lehigh Coal,* 56 F.Supp.2d at 569 (citing *Burger King,* 471 U.S. at 477). The factors to be considered in making this fairness determination are: (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.*

*7 Nothing on the record counsels strongly against jurisdiction based on considerations of any undue burden to Rosedale. Rosedale has not claimed that he

does not have the financial ability or that he would otherwise be irreparably prejudiced by litigating this case here in Pennsylvania. The Court also notes that Rosedale has able counsel on both coasts, i.e., in both his home state of California and here in Pennsylvania. Additionally, Pennsylvania has a substantial interest in protecting its residents from allegedly misleading representations that induce them to purchase virtual property. Pennsylvania also has an interest, more particularly, in vindicating Bragg's individual rights. Finally, Bragg may obtain convenient and effective relief in Pennsylvania, the state in which he initiated this action.

### C. *Fiduciary Shield Doctrine*

The Court must also address Rosedale's argument that, because Rosedale made the alleged representations in his corporate capacity as Chief Executive Officer of Linden, he cannot be subject to personal jurisdiction based on those representations.

The applicability of this so called " fiduciary shield" doctrine is in dispute. Although it has not definitively spoken on the issue, the Supreme Court appears to have rejected the proposition that this doctrine is a requirement of federal due process. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (" [Defendants'] status as employees does not somehow shield them from jurisdiction. Each defendant's contacts with the forum state must be assessed individually." ); *Keeton v. Hustler,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (" We today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." ). Moreover, neither the Pennsylvania Supreme Court nor the Third Circuit has squarely addressed the applicability of the fiduciary shield doctrine. *See, e.g., Irons v. Transcor Am.,* 2002 WL 32348317, at *5 (E.D.Pa.2002).

Fortunately, it is not necessary to untangle the confused knot of caselaw surrounding the fiduciary shield's status within the Third Circuit.[FN13] The Court will, in Gordian fashion, cut directly through the knot, because even if the doctrine did apply, the fiduciary shield would not protect Rosedale under these circumstances.

When corporate agents invoke the fiduciary shield as a protection, courts " have held that in order to hold such a defendant subject to personal jurisdiction, it must be shown that [1] the defendant had a major

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 7

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

role in the corporate structure, [2] the quality of his contacts with the state were significant, and [3] his participation in the tortious conduct alleged was extensive." *TJS Brokerage,* 940 F.Supp. at 789. First, as to his role in the company, Rosedale acted as the CEO and public face of Linden. Second, as to the quality of Rosedale's contacts, Rosedale made numerous representations that were broadcast through the national media and through the Internet, via town hall meetings, that reached Pennsylvania. These were not isolated statements, but part of a national campaign to distinguish Second Life from other virtual worlds and induce the purchase of virtual property. Third, and finally, Rosedale did not simply direct others to publicize virtual property on Second Life. He personally participated in creating such publicity and its dissemination. Representations made as part of that publicity are at the heart of Bragg's case.[FN14]

**\*8** Even if the fiduciary shield doctrine were expressly recognized by the Third Circuit, Rosedale's representations, though made on the behalf of Linden, would still count as contacts in the analysis of whether the Court may exercise personal jurisdiction over him. Therefore, the Court will exercise personal jurisdiction over Rosedale.

### III. MOTION TO COMPEL ARBITRATION

Defendants have also filed a motion to compel arbitration that seeks to dismiss this action and compel Bragg to submit his claims to arbitration according to the Rules of the International Chamber of Commerce (" ICC" ) in San Fransisco.

#### A. Relevant Facts

Before a person is permitted to participate in Second Life, she must accept the Terms of Service of Second Life (the " TOS" ) by clicking a button indicating acceptance of the TOS. Bragg concedes that he clicked the " accept" button before accessing Second Life. Compl. ¶ 126. Included in the TOS are a California choice of law provision, an arbitration provision, and forum selection clause. Specifically, located in the fourteenth line of the thirteenth paragraph under the heading " GENERAL PROVISIONS," and following provisions regarding the applicability of export and import laws to Second Life, the following language appears:
Any dispute or claim arising out of or in connection with this Agreement or the performance, breach or termination thereof, shall be finally settled by binding arbitration in San Francisco, California under the

Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with said rules.... Notwithstanding the foregoing, either party may apply to any court of competent jurisdiction for injunctive relief or enforcement of this arbitration provision without breach of this arbitration provision.

TOS ¶ 13.

#### B. Legal Standards

##### 1. Federal law applies

The Federal Arbitration Act (" FAA" ) requires that the Court apply federal substantive law here because the arbitration agreement is connected to a transaction involving interstate commerce. *State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710, 713 n. 1 (3d Cir.2000); *Marciano v. MONY Life Ins. Co.,* 470 F.Supp.2d 518, 524 (E.D.Pa.2007) (Robreno, J.); *see also* Wright & Miller, *Federal Practice and Procedure* § 3569, at 173 (1984) (" [I]n a diversity suit ..., the substantive rules contained in the [Federal Arbitration] Act, based as it is on the commerce and admiralty powers, are to be applied regardless of state law." ).

Whether the arbitration agreement is connected to a transaction involving interstate commerce is a factual determination that must be made by the Court. *State Farm,* 233 F.3d at 713 n. 1. Here, Bragg is a Pennsylvania resident. Linden is a Delaware corporation headquartered in California. Rosedale is a California resident. Bragg entered into the TOS and purchased virtual land through the Internet on Second Life as a result of representations made on the national media. The arbitration agreement is clearly connected to interstate commerce, and the Court will apply the federal substantive law that has emerged from interpretation of the FAA.

##### 2. The Legal Standard Under the FAA

**\*9** Under the FAA, on the motion of a party, a court must stay proceedings and order the parties to arbitrate the dispute if the court finds that the parties have agreed in writing to do so. 9 U.S.C. §§ 3, 4, 6. A party seeking to compel arbitration must show (1) that a valid agreement to arbitrate exists between the parties and (2) that the specific dispute falls within the scope of the agreement. *Trippe Mfg. Co. v. Niles Audio Corp.,* 401 F.3d 529, 532 (3d Cir.2005); *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3d Cir.1990).

In determining whether a valid agreement to arbitrate exists between the parties, the Third Circuit has instructed district courts to give the party opposing arbitration " the benefit of all reasonable doubts and inferences that may arise," or, in other words, to apply the familiar Federal Rule of Civil Procedure 56(c) summary judgment standard. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 & n. 9 (3d Cir.1980); *see also Berkery v. Cross Country Bank,* 256 F.Supp.2d 359, 364 n. 3 (E.D.Pa.2003) (Robreno, J.) (applying the summary judgment standard to a motion to compel arbitration). While there is a presumption that a particular dispute is within the *scope* of an arbitration agreement, *Volt Info. Scis., Inc. v. Bd. of Trustees,* 489 U.S. 468, 475, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), there is no such " presumption" or " policy" that favors the *existence* of a valid agreement to arbitrate. *Marciano,* 470 F.Supp.2d at 525-26.

### C. *Application*

#### 1. *Unconscionabilty of the Arbitration Agreement*

Bragg resists enforcement of the TOS's arbitration provision on the basis that it is " both procedurally and substantively unconscionable and is itself evidence of defendants' scheme to deprive Plaintiff (and others) of both their money and their day in court." Pl.'s Resp. At 16.[FN15]

Section 2 of the FAA provides that written arbitration agreements " shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, " generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (citations omitted). When determining whether such defenses might apply to any purported agreement to arbitrate the dispute in question, " courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Thus, the Court will apply California state law to determine whether the arbitration provision is unconscionable.[FN16]

Under California law, unconscionability has both

procedural and substantive components. *Davis v. O'Melveny & Myers,* --- F.3d ----, 2007 WL 1394530, at *4 (9th Cir. May 14, 2007); *Comb v. Paypal, Inc.,* 218 F.Supp.2d 1165, 1172 (N.D.Cal.2002). The procedural component can be satisfied by showing (1) oppression through the existence of unequal bargaining positions or (2) surprise through hidden terms common in the context of adhesion contracts. *Comb,* 218 F.Supp.2d at 1172. The substantive component can be satisfied by showing overly harsh or one-sided results that " shock the conscience." *Id.* The two elements operate on a sliding scale such that the more significant one is, the less significant the other need be. *Id.* at 743; *see Armendariz v. Foundation Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (Cal.2000) (" [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." ). However, a claim of unconscionability cannot be determined merely by examining the face of the contract; there must be an inquiry into the circumstances under which the contract was executed, and the contract's purpose, and effect. *Comb,* 218 F.Supp.2d at 1172.

#### (a) *Procedural Unconscionability*

*\*10* A contract or clause is procedurally unconscionable if it is a contract of adhesion. *Comb,* 218 F.Supp.2d at 1172; *Flores v. Transamerica HomeFirst, Inc.,* 93 Cal.App.4th 846, 113 Cal.Rptr.2d 376, 381-82 (Ct.App.2001). A contract of adhesion, in turn, is a " standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Comb,* 218 F.Supp.2d at 1172; *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690. Under California law, " the critical factor in procedural unconscionability analysis is the manner in which the contract or the disputed clause was presented and negotiated." *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1282 (9th Cir.2006). " When the weaker party is presented the clause and told to ' take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present." *Id.* (internal quotation and citation omitted); *see also Martinez v. Master Prot. Corp.,* 118 Cal.App.4th 107, 12 Cal.Rptr.3d 663, 669 (Ct.App.2004) (" An arbitration agreement that is an essential part of a ' take it or leave it' employment condition, without more, is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 9

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

procedurally unconscionable." ) (citations omitted); _O'Melveny & Myers, --- F.3d ----, 2007 WL 1394530 at *6_ (holding arbitration agreement presented on a take-it-or-leave-it basis was procedurally unconscionable, notwithstanding the fact that employee was provided three months to walk away from employment before agreement became effective).

The TOS are a contract of adhesion. Linden presents the TOS on a take-it-or-leave-it basis. A potential participant can either click " assent" to the TOS, and then gain entrance to Second Life's virtual world, or refuse assent and be denied access. Linden also clearly has superior bargaining strength over Bragg. Although Bragg is an experienced attorney, who believes he is expert enough to comment on numerous industry standards and the " rights" of participants in virtual worlds, _see_ Pl.'s Resp., Ex. A ¶¶ 59-64, he was never presented with an opportunity to use his experience and lawyering skills to negotiate terms different from the TOS that Linden offered.

Moreover, there was no " reasonably available market alternatives [to defeat] a claim of adhesiveness." _Cf. Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal.App.3d 758, 259 Cal.Rptr. 789, 795 (Ct.App.1989)_ (finding no procedural unconscionability because there were other financial institutions that offered competing IRA's which lacked the challenged provision). Although it is not the only virtual world on the Internet, Second Life was the first and only virtual world to specifically grant its participants property rights in virtual land.

The procedural element of unconscionability also " focuses on ... surprise." _Gutierrez v. Autowest, Inc., 114 Cal.App.4th 77, 7 Cal.Rptr.3d 267, 275 (Ct.App.2003)_ (citations omitted). In determining whether surprise exists, California courts focus not on the plaintiff's subjective reading of the contract, but rather, more objectively, on " the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." _Id._ In _Gutierrez,_ the court found such surprise where an arbitration clause was " particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page of the lease." _Id._

**\*11** Here, although the TOS are ubiquitous throughout Second Life,[FN17] Linden buried the TOS's arbitration provision in a lengthy paragraph under the benign heading " GENERAL PROVISIONS." _See_ TOS ¶ 13. _Compare Net Global Mktg. v. Dialtone, Inc.,_ No. 04-56685, 2007 U.S.App. LEXIS 674 at *7 (9th Cir. Jan. 9, 2007) (finding procedural unconscionability where " [t]here was no ' clear heading' in the Terms of Service that could refute a claim of surprise; to the contrary, the arbitration clause is listed in the midst of a long section without line breaks under the unhelpful heading of ' Miscellaneous" ' ) _and Higgins v. Superior Court, 140 Cal.App.4th 1238, 45 Cal.Rptr.3d 293, 297 (Ct.App.2006)_ (holding arbitration agreement unconscionable where " [t]here is nothing in the Agreement that brings the reader's attention to the arbitration provision" ) _with Boghos v. Certain Underwriters at Lloyd's of London, 36 Cal.4th 495, 30 Cal.Rptr.3d 787, 115 P.3d 68, 70 (Cal.2005)_ (finding arbitration clause was enforceable where it was in bolded font and contained the heading " BINDING ARBITRATION" ). Linden also failed to make available the costs and rules of arbitration in the ICC by either setting them forth in the TOS or by providing a hyper-link to another page or website where they are available. Bragg Decl. ¶ 20.

_Comb_ is most instructive. In that case, the plaintiffs challenged an arbitration provision that was part of an agreement to which they had assented, in circumstances similar to this case, by clicking their assent on an online application page. _218 F.Supp.2d at 1169._ The defendant, PayPal, was a large company with millions of individual online customers. _Id._ at _1165._ The plaintiffs, with one exception, were all individual customers of PayPal. _Id._ Given the small amount of the average transaction with PayPal, the fact that most PayPal customers were private individuals, and that there was a " dispute as to whether PayPal's competitors offer their services without requiring customers to enter into arbitration agreements," the court concluded that the user agreement at issue " satisfie[d] the criteria for procedural unconscionability under California law." _Id._ at 1172-73. Here, as in _Comb,_ procedural unconscionability is satisfied.

(b) _Substantive Unconscionability_

Even if an agreement is procedurally unconscionable, " it may nonetheless be enforceable if the substantive terms are reasonable." _Id._ at 1173 (citing _Craig v. Brown & Root, Inc., 84 Cal.App.4th 416, 100 Cal.Rptr.2d 818 (Ct.App.2000)_ (finding contract of adhesion to arbitrate disputes enforceable)). Substantive unconscionability focuses on the one-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ---                                                                                      Page 10

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

sidedness of the contract terms. *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690; *Flores,* 113 Cal.Rptr.2d at 381-82. Here, a number of the TOS's elements lead the Court to conclude that Bragg has demonstrated that the TOS are substantively unconscionable.

### (i) *Mutuality*

Under California law, substantive unconscionability has been found where an arbitration provision forces the weaker party to arbitrate claims but permits a choice of forums for the stronger party. *See, e.g., Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931, 940-41 (9th Cir.2001); *Mercuro v. Superior Court,* 96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 675 (Ct.App.2002). In other words, the arbitration remedy must contain a " modicum of bilaterality." *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 692. This principle has been extended to arbitration provisions that allow the stronger party a range of remedies before arbitrating a dispute, such as self-help, while relegating to the weaker party the sole remedy of arbitration.[FN18]

*12 In *Comb,* for example, the court found a lack of mutuality where the user agreement allowed PayPal " at its sole discretion" to restrict accounts, withhold funds, undertake its own investigation of a customer's financial records, close accounts, and procure ownership of all funds in dispute unless and until the customer is " later determined to be entitled to the funds in dispute." 218 F.Supp.2d at 1173-74. Also significant was the fact that the user agreement was " subject to change by PayPal without prior notice (unless prior notice is required by law), by posting of the revised Agreement on the PayPal website." *Id.*

Here, the TOS contain many of the same elements that made the PayPal user agreement substantively unconscionable for lack of mutuality. The TOS proclaim that " Linden has the right at any time for any reason or no reason to suspend or terminate your Account, terminate this Agreement, and/or refuse any and all current or future use of the Service without notice or liability to you." TOS ¶ 7.1. Whether or not a customer has breached the Agreement is " determined in Linden's sole discretion." *Id.* Linden also reserves the right to return no money at all based on mere " suspicions of fraud" or other violations of law. *Id.* Finally, the TOS state that " Linden may amend this Agreement ... at any time in its sole discretion by posting the amended Agreement [on its website]." TOS ¶ 1.2.

In effect, the TOS provide Linden with a variety of one-sided remedies to resolve disputes, while forcing its customers to arbitrate any disputes with Linden. This is precisely what occurred here. When a dispute arose, Linden exercised its option to use self-help by freezing Bragg's account, retaining funds that Linden alone determined were subject to dispute, and then telling Bragg that he could resolve the dispute by initiating a costly arbitration process. The TOS expressly authorized Linden to engage in such unilateral conduct. As in *Comb,* " [f]or all practical purposes, a customer may resolve disputes only after [Linden] has had control of the disputed funds for an indefinite period of time," and may only resolve those disputes by initiating arbitration. 218 F.Supp.2d at 1175.

Linden's right to modify the arbitration clause is also significant. " The effect of [Linden's] unilateral right to modify the arbitration clause is that it could ... craft precisely the sort of asymmetrical arbitration agreement that is prohibited under California law as unconscionable. *Net Global Mktg.,* 2007 U.S.App. LEXIS 674, at *9. This lack of mutuality supports a finding of substantive unconscionability.

### (ii) *Costs of Arbitration and Fee-Sharing*

Bragg claims that the cost of an individual arbitration under the TOS is likely to exceed $13,540, with an estimated initiation cost of at least $10,000. Pl.'s Reply at 5-6. He has also submitted a Declaration of Personal Financial Information stating that such arbitration would be cost-prohibitive for him (doc. no. 41). Linden disputes Bragg's calculations, estimating that the costs associated with arbitration would total $7,500, with Bragg advancing $3,750 at the outset of arbitration. *See* Dfts.' Reply at 11.

*13 At oral argument, the parties were unable to resolve this dispute, even after referencing numerous provisions and charts contained within the ICC Rules. *See* Tran. of 2/5/07 Hrg. at 65-74. The Court's own calculations, however, indicate that the costs of arbitration, excluding arbitration, would total $17,250. With a recovery of $75,000,[FN19] the ICC's administrative expenses would be $2,625 (3.5% of $75,000). *See* ICC Rules at 28. In addition, arbitrator's fees could be set between 2.0% ($1,500) and 11.0% ($8,250) of the amount at issue per arbitrator. *Id.* If the ICC set the arbitrator's fees at the mid-point of this range, the arbitrator's fees would be $4,875 per arbitrator. *Id.* Here, however, the TOS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 11

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

requires that three arbitrators be used to resolve a dispute. TOS ¶ 13. Thus, the Court estimates the costs of arbitration with the ICC to be $17,250 ($2,625 + (3 x $4,875)), although they could reach as high as $27,375 ($2,625 + (3 x $8,250)) .[FN20]

These costs might not, on their own, support a finding of substantive unconscionability. However, the ICC Rules also provide that the costs and fees must be shared among the parties, and an estimate of those costs and fees must be advanced at the initiation of arbitration. See ICC Rules of Arbitration, Ex. D to Dfts.' Reply at 28-30. California law has often been applied to declare arbitration fee-sharing schemes unenforceable. See _Ting v. AT & T,_ 319 F.3d 1126, 1151 (9th Cir.2003). Such schemes are unconscionable where they " impose [ ] on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court." _Id._ In _Ting,_ for example, the Ninth Circuit held that a scheme requiring AT & T customers to split arbitration costs with AT & T rendered an arbitration provision unconscionable. _Id. See also Circuit City Stores v. Adams,_ 279 F.3d 889, 894 (9th Cir.2002) (" This fee allocation scheme alone would render an arbitration agreement unenforceable." ); _Armendariz,_ 99 Cal.Rptr.2d 745, 6 P.3d at 687 (" [T]he arbitration process cannot generally require the employee to bear any _type_ of expenses that the employee would not be required to bear if he or she were free to bring the action in court." ) (emphasis in original); _Ferguson v. Countrywide Credit Indus.,_ 298 F.3d 778, 785 (9th Cir.2002) ( " [A] fee allocation scheme which requires the employee to split the arbitrator's fees with the employer would _alone_ render an arbitration agreement substantively unconscionable." ) (emphasis added).

Here, even taking Defendants characterization of the fees to be accurate, the total estimate of costs and fees would be $7,500, which would result in Bragg having to advance $3,750 at the outset of arbitration. See Dfts.' Reply at 11. The court's own estimates place the amount that Bragg would likely have to advance at $8,625, but they could reach as high as $13,687.50. Any of these figures are significantly greater than the costs that Bragg bears by filing his action in a state or federal court. Accordingly, the arbitration costs and fee-splitting scheme together also support a finding of unconscionability.

### (iii) Venue

*14 The TOS also require that any arbitration take

place in San Francisco, California. TOS ¶ 13. In _Comb,_ the Court found that a similar forum selection clause supported a finding of substantive unconscionability, because the place in which arbitration was to occur was unreasonable, taking into account " the respective circumstances of the parties." 218 F.Supp.2d at 1177. As in _Comb,_ the record in this case shows that Linden serves millions of customers across the United States and that the average transaction through or with Second Life involves a relatively small amount. See id. In such circumstances, California law dictates that it is not " reasonable for individual consumers from throughout the country to travel to one locale to arbitrate claims involving such minimal sums." _Id._ Indeed, " [l]imiting venue to [Linden's] backyard appears to be yet one more means by which the arbitration clause serves to shield [Linden] from liability instead of providing a neutral forum in which to arbitrate disputes." _Id._

### (iv) Confidentiality Provision

Arbitration before the ICC, pursuant to the TOS, must be kept confidential pursuant to the ICC rules. See ICC Rules at 33. Applying California law to an arbitration provision, the Ninth Circuit held that such confidentiality supports a finding that an arbitration clause was substantively unconscionable. _Ting,_ 319 F.3d at 1152. The Ninth Circuit reasoned that if the company succeeds in imposing a gag order on arbitration proceedings, it places itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, the company accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. _Id._ The unavailability of arbitral decisions could also prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct against a company. See id.

This does not mean that confidentiality provisions in an arbitration scheme or agreement are, in every instance, per se unconscionable under California law. See _Mercuro v. Superior Court,_ 96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 679 (Ct.App.2002) (" While [the California] Supreme Court has taken notice of the ' repeat player effect,' the court has never declared this factor renders the arbitration agreement unconscionable per se." ) (citations omitted). Here, however, taken together with other provisions of the TOS, the confidentiality provision gives rise for concern of the consciability of the arbitration

--- F.Supp.2d ---                                                    Page 12

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

(Cite as: --- F.Supp.2d ----)

clause. *See also* O'Melveny & Myers, --- F.3d ----, 2007 WL 1394530, at *11 (" The concern is not with confidentiality itself but, rather, with the scope of the language of the [arbitration agreement.]" ).

Thus, the confidentiality of the arbitration scheme that Linden imposed also supports a finding that the arbitration clause is unconscionable.

(v) *Legitimate Business Realities*

**\*15** Under California law, a contract may provide a " margin of safety" that provides the party with superior bargaining strength protection for which it has a legitimate commercial need. " However, unless the ' business realities' that create the special need for such an advantage are explained in the contract itself, ... it must be factually established." *Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th 1519, 60 Cal.Rptr.2d 138, 148 (Ct.App.1997). When a contract is alleged to be unconscionable, " the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination." Cal. Civ.Code § 1670.5. The statutory scheme reflects " legislative recognition that a claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect." *Stirlen,* 60 Cal.Rptr.2d at 148 (citations and internal quotations omitted).

Here, neither in its briefing nor at oral argument did Linden even attempt to offer evidence that " business realities" justify the one-sidedness of the dispute resolution scheme that the TOS constructs in Linden's favor.

(c) *Conclusion*

When a dispute arises in Second Life, Linden is not obligated to initiate arbitration. Rather, the TOS expressly allow Linden, at its " sole discretion" and based on mere " suspicion," to unilaterally freeze a participant's account, refuse access to the virtual and real currency contained within that account, and then confiscate the participant's virtual property and real estate. A participant wishing to resolve any dispute, on the other hand, after having forfeited its interest in Second Life, must then initiate arbitration in Linden's place of business. To initiate arbitration involves advancing fees to pay for no less than three arbitrators at a cost far greater than would be involved in litigating in the state or federal court system. Moreover, under these circumstances, the

confidentiality of the proceedings helps ensure that arbitration itself is fought on an uneven field by ensuring that, through the accumulation of experience, Linden becomes an expert in litigating the terms of the TOS, while plaintiffs remain novices without the benefit of learning from past precedent.

Taken together, the lack of mutuality, the costs of arbitration, the forum selection clause, and the confidentiality provision that Linden unilaterally imposes through the TOS demonstrate that the arbitration clause is not designed to provide Second Life participants an effective means of resolving disputes with Linden. Rather, it is a one-sided means which tilts unfairly, in almost all situations, in Linden's favor. As in *Comb,* through the use of an arbitration clause, Linden " appears to be attempting to insulate itself contractually from any meaningful challenge to its alleged practices." 218 F.Supp.2d at 1176.

The Court notes that the concerns with procedural unconscionability are somewhat mitigated by Bragg's being an experienced attorney. However, " because the unilateral modification clause renders the arbitration provision severely one-sided in the substantive dimension, even moderate procedural unconscionability renders the arbitration agreement unenforceable." *Net Global Mktg .,* 2007 U.S.App. LEXIS 674, at *9 (internal citations omitted).

**\*16** Finding that the arbitration clause is procedurally and substantively unconscionable, the Court will refuse to enforce it.[FN21]

2. *" Bluelining" the Arbitration Agreement*

Alternatively, Linden has offered to ameliorate the one-sidedness of the TOS's arbitration provision by suggesting that Linden could waive the requirements for three arbitrators, post the initial fees of arbitration, and agree to arbitrate in Philadelphia instead of San Francisco. *See* Dfts.' Sur-Reply Brf. at 2-3 (doc. no. 2).

California law allows a court to " blueline" an arbitration agreement to remove an element that renders it substantively unconscionable. *See* Cal. Civ.Code § 1670.5(a) (" If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the

--- F.Supp.2d ----

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

(Cite as: --- F.Supp.2d ----)

application of any unconscionable clause as to avoid any unconscionable result." ). However, a court is not obligated to blueline when an " arbitration provision is so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting the contract." *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1293 (9th Cir.2006). Where an arbitration provision has " multiple defects that indicate a systematic effort to impose arbitration on [the plaintiff], not simply as an alternative to litigation, but as an inferior forum that works to [the defendant's] advantage," and there simply is " no single provision [the court] can strike or restrict in order to remove the unconscionable taint from the agreement," the court can simply refuse to enforce the arbitration provision. *Id.* (citing *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 696).

The arbitration clause before the Court is simply not one where a single term may be stricken to render the agreement conscionable. " The unilateral modification ' pervade[s]' and ' taint[s] with illegality' the entire agreement to arbitrate, [and] severance of terms within the arbitration clause would not cure the problem. *Net Global Mktg.,* 2007 U.S.App. LEXIS 674, at *9 (quoting *Circuit City,* 279 F.3d at 895 (citations omitted)); *see also Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 697 (" [M]ultiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage.... Because a court is unable to cure this unconscionability through severance or restriction, and is not permitted to cure it through reformation and augmentation, it must void the entire agreement." ). *Davis,* 2007 WL 1394530, at * 15 (refusing to rewrite arbitration agreement that contained four substantively unconscionable or void terms because " [t]hese provisions cannot be stricken or excised without gutting the agreement" ). Bluelining in this case will require the redrafting of the agreement.

**\*17** The Court declines to rewrite the agreement, at Linden's request, to save an unconscionable arbitration provision which Linden itself drafted and now seeks to enforce. Rather than provide a reasonable alternative for dispute resolution, this agreement compels a one-sided resolution of disputes between the parties.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny

Rosedale's motion to dismiss for lack of jurisdiction. The Court will also deny Defendants' motion to compel arbitration. An appropriate order follows.

## ORDER

AND NOW, this 30th day of May, 2007, it is hereby ORDERED that defendant Philip Rosedale's Motion to Dismiss for Lack of Jurisdiction (doc. no. 2) and defendant Linden Research, Inc.'s Motion to Compel Arbitration (doc. no. 3) are DENIED.

It is FURTHER ORDERED that Plaintiff's Motion for Leave to File Supplemental Briefs in Opposition to Defendants Motions to Dismiss and to Compel Arbitration to Address Issues Raised by the Court at Argument on February 5, 2007 (doc. no. 34) is DENIED as moot.

AND IT IS SO ORDERED.

> FN1. The virtual world at issue is an interactive computer simulation which lets its participants see, hear, use, and even modify the simulated objects in the computer-generated environment. *See* Woodrow Barfield, *Intellectual Property Rights in Virtual Environments: Considering the Rights of Owners, Programmers and Virtual Avatars,* 39 Akron L.Rev. 649, 649 (2006) (defining virtual world).

> FN2. Second Life is hosted at http://secondlife.com.

> FN3. The term " avatar" derives etymologically from the Sanskrit word for crossing down or descent and was used originally to refer to the earthly incarnation of a Hindu deity. Webster's II New Riverside University Dictionary 141 (1998). Since the advent of computers, however, " avatar" is also used to refer to an Internet user's virtual representation of herself in a computer game, in an Internet chat room, or in other Internet fora. *See* Wikipedia, Definition of Avatar, *available at* http://en.wikipedia.org.

> FN4. Judge Richard A. Posner has apparently made an appearance in Second Life as a " balding bespectacled cartoon rendering of himself" where he " addressed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 14

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

a crowd of other animated characters on a range of legal issues, including property rights in virtual reality." Alan Sipress, *Where Real Money Meets Virtual Reality, the Jury is Still Out,* Washington Post, Dec. 26, 2006, at A1.

FN5. Although participants purchase virtual property using the virtual currency of " lindens," lindens themselves are bought and sold for real U.S. dollars. Linden maintains a currency exchange that sets an exchange rate between lindens and U.S. dollars. Third parties, including ebay.com, also provide additional currency exchanges.

FN6. Plaintiff has inundated the Court with press releases, newspaper articles, and other media containing representations made by Rosedale regarding the ownership of property on Second Life. Plaintiff states in an affidavit that he reviewed and relied on some of these representations. Bragg Decl. ¶¶ 4-10, 65-68. It is of no moment that Plaintiff did not rely upon every single representation that Rosedale ever made regarding ownership of virtual property on Second Life. The immense quantity of such representations is relevant to showing that these are not isolated statements, but rather, part of a national campaign in which defendant Rosedale individually and actively participated.

FN7. Linden taxes virtual land. In fact, according to Bragg, by June 2004, Linden reported that its " real estate tax revenue on land sold to the participants exceeded the amount the company was generating in subscriptions." Compl. ¶ 42.

FN8. Bragg's complaint contains counts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. (Count I), the California Unfair and Deceptive Practices Act, Cal. Bus. & Prof.Code § 17200 (Count II), California Consumer Legal Remedies Act, Ca. Civ.Code § 1750, et seq. (Count III), fraud (Count IV), the California Civil Code § 1812.600, et seq. (Count V), conversion (Count VI), intentional interference with a contractual relations (Count VII), breach of contract (Count VIII), unjust enrichment

(Count IX), and tortious breach of the covenant of good faith and fair dealing (Count X).

FN9. In the conclusion of the argument section of his brief, for example, Bragg argues that Rosedale's " representations and inducements properly form the basis of specific jurisdiction against Defendant Rosedale." Pl.'s Resp. at 14.

FN10. The Supreme Court has also held, under different circumstances, that defamatory statements distributed in the national media may support specific personal jurisdiction where those statements are relevant to a plaintiff's claims. In *Calder v. Jones,* a Californian plaintiff sued a group of Floridian defendants for placing a defamatory article about her in a nationally circulated publication. 465 U.S. 783, 788-89, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The plaintiff claimed that the defendants should be subject to jurisdiction in her home state of California. *Id.* The Supreme Court held that, because the defendant's intentional and allegedly illegal actions were expressly aimed at California and caused harm there, jurisdiction over the defendants was " proper in California based on the ' effects' of their Florida conduct in California." *Id.* at 789. Here, as in *Calder,* Rosedale's alleged misrepresentations are relevant to Bragg's claims of fraud and deceptive practices, but Bragg has not argued that jurisdiction is proper based on *Calder* 's effects-based jurisprudence.

FN11. The Third Circuit has consistently held that advertising in national publications does not subject a defendant to *general jurisdiction* in every state. *See, e.g.,* Gehling, 773 F.2d 539 at 542; Giangola, 753 F.Supp. at 156 (" In an age of modern advertising and national media publications and markets, plaintiffs' argument that such conduct would make a defendant amenable to suit wherever the advertisements were aired would substantially undermine the law of personal jurisdiction." ). In *Giangola,* for example, a district court held that plaintiffs' viewing of advertisements displaying Walt Disney World " as a must visit" on plaintiffs' vacation agenda, and which in fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                              Page 15

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

**(Cite as: --- F.Supp.2d ----)**

induced plaintiffs to visit Disney World, did not constitute " minimum contacts" sufficient to justify personal jurisdiction in the plaintiffs' subsequent personal injury action, because the advertisements were not in any way related to the plaintiffs' personal injury action. 753 F.Supp. at 155. Moreover, as the Third Circuit noted in *Barefoot,* the advertisements were passive in nature and did not involve any interactivity with the plaintiffs. *Id.; Barefoot,* 128 Fed. App'x at 270.

FN12. Because the Court bases its holding on the interactive nature of the marketing scheme, the holding does not " mean that there would be nationwide (indeed, worldwide) jurisdiction over anyone and everyone who establishes an Internet website" or made representations posted on a website accessible throughout the world. *Weber v. Jolly Hotels,* 977 F.Supp. 327, 333 (D.N.J.1997).

FN13. Some Third Circuit precedent suggests that, where the alleged contacts involve a corporate agent's personal involvement, the " corporate shield" doctrine is obviated. *See Al-Khazraji v. St. Francis College,* 784 F.2d 505, 518 (3d Cir.1986) (" An individual, including a director, officer, or agent of a corporation, may be liable for injuries suffered by third parties because of his torts, regardless of whether he acted on his own account or on behalf of the corporation." ). On other occasions, however, after finding personal jurisdiction has existed over a corporation, the Third Circuit has remanded to address the question of whether the individual corporate agents were not subject to personal jurisdiction because their relevant contacts were established in their roles as corporate officers. *See Barefoot,* 128 Fed. App'x at 269.
Numerous recent cases within this district have applied the fiduciary shield doctrine in one form or another. *E.g. Schiller-Pfeiffer, Inc. v. Country Home Prods., Inc.,* 2004 WL 2755585 (E.D.Pa.2004) (" [A] defendant is not individually subject to personal jurisdiction merely based on his actions in a corporate capacity." ) (citing *TJS Brokerage & Co. v. Mahoney,* 940 F.Supp. 784, 789

(E.D.Pa.1996); *D & S Screen Fund II v. Ferrari,* 174 F.Supp.2d 343, 347 (E.D.Pa.2001) (" As a general rule, individuals performing acts in their corporate capacity are not subject to the personal jurisdiction of the courts of that state for those acts." ).

FN14. Defendants concede that the Court has personal jurisdiction over Linden. However, Bragg does not argue that personal jurisdiction was appropriate over Rosedale based on his direction of Linden as it made contacts with Pennsylvania. Bragg relies, instead, solely on Linden's individual contacts. Had Plaintiff argued the former, the Court's application of the fiduciary shield doctrine could have been a closer call.

FN15. This challenge must be determined by the Court, not an arbitrator. *Bellevue Drug Co. v. Advance PCS,* 333 F.Supp.2d 318 (E.D.Pa.2004) (Robreno, J.). Bragg does not challenge enforceability by claiming that a provision of the arbitration agreement will deny him a statutory right, a question of interpretation of the arbitration agreement which an arbitrator is " well situated to answer." *Id.* (citations omitted). Rather, Bragg claims that the arbitration agreement itself would effectively deny him access to an arbitrator, because the costs would be prohibitively expensive, a question that is more appropriately reserved for the Court to answer. *Id.*

FN16. Both parties agree that California law should govern the question of whether the arbitration provision is unconscionable.

FN17. For example, both the " Auctions" and the " Auctions FAQ" webpages in Second Life contain hyperlinks to the TOS. *See* Bragg Br., Ex. 2 at 9, 15.

FN18. The Court notes that the Third Circuit has found that " parties to an arbitration agreement need not equally bind each other with respect to an arbitration agreement if they have provided each other with consideration beyond the promise to arbitrate." *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 180-81 (3d Cir.1999). In *Green Tree,* however, the Third Circuit was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 16
--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)
(Cite as: --- F.Supp.2d ----)

applying Pennsylvania law, not California law. *Id.* In any event, Pennsylvania courts have criticized this aspect of *Green Tree*'s holding. *E.g. Lytle v. Citifinancial Servs., 810 A.2d 643, 665 (Pa.Super.Ct.2002)* (holding that, under Pennsylvania law, the reservation by a company to itself of access to the courts, to the exclusion of the consumer, created a presumption of unconscionability, " which in the absence of ' business realities' that compel inclusion of such a provision in an arbitration provision, render[ed] the arbitration provision unconscionable and unenforceable" ).

FN19. The Court's calculations are based on its finding that $75,000 is at issue, the minimum necessary to satisfy the requirements of diversity jurisdiction in this case. After a hearing on Bragg's motion to remand this case back to state court, the Court found that this jurisdictional threshold had been met (doc. no. 14).

FN20. At oral argument, Bragg asserted repeatedly that the schedule of arbitrator's fees in the ICC Rules represents the fee " per arbitrator," which would have to be tripled in this case as the TOS provides for three arbitrators. *See* Tran. of 2/5/07 Hrg. at pp. 68, 74. Defendants never refuted this point. *See id.*

FN21. Having determined that the arbitration provision is unenforceable as an unconscionable agreement, the Court need not determine whether the specific dispute in this case falls within the scope of that agreement. The Court notes, however, that the arbitration clause clearly exempts from its scope claims for " injunctive relief." *See* TOS ¶ 13. At the hearing on the motion to compel arbitration, the Court asked whether Bragg wanted the Court to decide the motion to compel arbitration, or allow Plaintiff file an amended complaint seeking only injunctive relief. *See* Tran. of 2/5/07 Hrg. at pp. 89-90, 108. He elected to file an amended complaint. *Id.* Subsequently, however, he filed supplemental briefing in support of his original complaint, and after Defendants objected, filed a Proposed Amended Complaint " [a]s promised." Pl.s' Suppl. Brf. in Opp. to Mot. to Compel at 12

(doc. no. 43). During a telephone conference on May 8, 2007, however, Bragg finally clarified that he intended to stand on his original complaint.

E.D.Pa.,2007.

Bragg v. Linden Research, Inc.

--- F.Supp.2d ----, 2007 WL 1549013 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# E

Westlaw.

Not Reported in F.Supp.2d                                                     Page 2

Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

**H**

Padcom, Inc. v. NetMotion Wireless, Inc.

D.Del.,2004.

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

PADCOM, INC., Plaintiff,

v.

NETMOTION WIRELESS, INC. and Database Solutions, Inc., Defendants.

**No. Civ. 03-983-SLR.**

May 24, 2004.

Josy W. Ingersoll, John W. Shaw, and Adam W. Poff, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Neil G. Greenblum, Van C. Ernest, and Jill M. Browning, of Greenblum & Bernstein, P.L.C., Reston, Virginia, of counsel.

Mary B. Graham, and James W. Parrett, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, John Allcock, M. Elizabeth Day, William G. Goldman, and Michael G. Schwartz, of Gray, Cary Ware & Freidenrich, LLP, Palo Alto, California, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On October 26, 2003, plaintiff Padcom Inc. (" Padcom" ) filed this patent action alleging infringement of its United States Patent Nos. 6,418,324 (" the '324 patent" ) and 6,198,920 (" the '920 patent" ) by defendants NetMotion Wireless, Inc. (" NetMotion" ) and Database Solutions, Inc. (" DSI" ). (D.I.1) Padcom also contends that NetMotion intentionally and wrongfully interfered with contractual and business relations with potential customers.

NetMotion has moved to dismiss based on lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and improper venue under Fed. R. 12(b)(3). (D.I.9) DSI has moved to transfer the remaining portion of the litigation to the Northern District of California pursuant to 28 U.S.C. § 1404(a). [FN1] Alternatively, if the court dismisses NetMotion and declines to transfer the case against DSI, defendants

move to stay this action pending resolution of the California case. Padcom opposes the motion (D.I.23, 24) and defendants' have filed their reply. (D.I.27, 28)

> FN1. On November 7, 2003, NetMotion and DSI filed a declaratory action in the Northern District of California mirroring the issues raised in this action. By order and stipulation dated December 10, 2003, the California action was stayed pending resolution of this first-filed action. *NetMotion Wireless, Inc. v. Padcom, Inc.,* 03-cv-04963-MMC, (N.D.Ca.2003) (D.I.12). A case management conference is scheduled for June 18, 2004. (*Id.,* D.I. 19)

II. BACKGROUND

A. The parties

Padcom is a Pennsylvania corporation with its principal place of business in Bethlehem, Pennsylvania. Founded in 1989, Padcom is in the business of developing, making, licensing, selling and servicing software and hardware products that enhance connectivity for wireless network uses. (D.I.1) The patent-in-suit relate to wireless communications and data transfers between remote devises and host systems. (D.I.10)

NetMotion is a corporation organized under the laws of Washington with a principal place of business in Seattle, Washington. (D.I.11) NetMotion is in the business of designing, developing and selling mobility software. Mobility software is client/server based software that extends the enterprise network to the mobile environment and allows mobile users on both wide area and local area networks secure access to the enterprise application and information. (D.I.10) NetMotion's corporate office, research and development facility, and engineering, sales, marketing and manufacturing facilities are all located in Seattle. Of NetMotion's 53 employees, 46 reside in Washington. The other seven employees reside in Ohio, Pennsylvania, Florida, Georgia, Texas, California and Illinois. (D.I.11) NetMotion maintains and supports a web site in Washington. The web site provides: 1) company and product information; 2) partner information; and 3) download information.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

None of NetMotion's products are available for purchase through its website; however, free trial versions of NetMotion's software are available for download from the web site. (D.I.12)

On February 2, 2001, a predecessor of NetMotion, WRQ, Inc., entered into a Value Added Reseller (" VAR" ) agreement with DSI. (D .I. 11, Ex. A) DSI is a Delaware corporation with its principal place of business in Cherry Hill, New Jersey. (D.I.13) DSI does not have an office in Delaware. DSI is in the business of providing integrated enterprise applications, databases and network solutions. DSI is a reseller of NetMotion products, however, DSI has never used, manufactured, sold or offered for sale any NetMotion product in Delaware or elsewhere. D.I. 13 ¶ 6) Pursuant to the VAR agreement, NetMotion has agreed to indemnify DSI.

### III. STANDARD OF REVIEW

*2 Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capital Intern. Ltd. v. Rudolph Wolff & Co., 484 U.S. 97, 104 (1987). The principle pronounced above is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected " pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause.[FN2] LaNuova D & B S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del.1986).

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state

accused infringer, the law of the Federal Circuit, " rather than that of the regional circuit in which the case arose," is applicable. Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed.Cir.1995). The court has instructed that, " in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed.Cir.1998). The court acknowledges that the Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

However, since the Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, the court must determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. Intel Corp. v. Silicon Storage Tech., Inc., 20 F.Supp.2d 690, 694 (D.Del.1998); see generally, Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945).

Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred between the forum state and defendant to support jurisdiction. [FN3] Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir.1987). To meet this burden, the plaintiff must demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state. In contrast, general jurisdiction does not require that the defendant's connections be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. American Bio Medica Corp. v. Penisula Drug Analysis Co, Inc ., Civ. No. 99-218-SLR, 1999 WL 615175 (D.Del.1999).

> FN3. The record reflects that the parties have engaged in limited jurisdictional discovery. (D.I.24, Ex. A, Ex. B)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

**\*3** (3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c). The above provisions have been construed " liberally so as to provide jurisdiction to the maximum extent possible" in order " to provide residents a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997).

## IV. DISCUSSION

NetMotion argues that its contacts with Delaware are too attenuated to establish either specific or general jurisdiction under Delaware's long-arm statute. (D.I.10)

Padcom asserts that NetMotion is subject to jurisdiction under three sections of the Delaware long-arm statute: § 3104(c)(1), (c)(4) and (c)(3). Padcom argues that § 3104(c)(1) and (c)(4), confer jurisdiction because NetMotion has repeatedly transacted and solicited business in Delaware. Specifically: (1) NetMotion shipped an infringing product to the Wilmington Police Department to enable them to evaluate the product in anticipation of a sale; (2) NetMotion has contacted Delaware residents by mail, email and telemarketing, either cold calling or in response to inquiries about the product; and (3) NetMotion operates a national interactive web site.

In opposition, NetMotion presents the affidavit of its CFO, Bob Colliton. (D.I.12, 28) Colliton avers:

NetMotion maintains and supports a web site in the state of Washington, but none of NetMotion's products are available for purchase through NetMotion's web site. NetMotion's web site offers free trial downloads of its software, as well as white papers that outline the capabilities of NetMotion's software products.

NetMotion has not contacted or otherwise engaged any company in Delaware to download a free trial version of NetMotion's software. NetMotion is aware of one trial download of its software from an entity in Delaware-the Wilmington Police Department. This download was not the result of any targeted or direct marketing on the part of NetMotion. Instead, the Wilmington Police Department was directed to NetMotion's web site through an offer that Hewlett-Packard included in the purchase of certain models of their iPAQ products. In particular, Hewlett-Packard included marketing information on a number of third party products on the installation CD for the iPAC. NetMotion was one of the wireless companies that Hewlett-Packard chose to include product information about, with a link to NetMotion's web site for a free trial version of the software. At no time prior to or after this download has any employee contacted the Wilmington Police Department. NetMotion's advertising strategy is national in nature. It is not directed to any particular region, state or company. On occasion, NetMotion has utilized the services of a third party tele-marketing organization to obtain information regarding potential customers. Prospective customers in Delaware may have been contacted by this third party organization.

**\*4** (D.I.12) He states further that NetMotion has never used, sold, manufactured or offered for sale an accused product in Delaware. In his reply declaration, however, Colliton does acknowledge that in January 2004, NetMotion electronically transmitted its Mobility Connection Newsletter nationwide. Over 12,000 received this material, including 23 entities in Delaware. Nonetheless, Colliton indicates that no revenue was received from the 23 emails. Padcom responds that it is unnecessary to consummate a sale for jurisdictional purposes. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* Civ. No. 99-218-SLR, 1999 WL 615175 (D.Del.1999). Padcom maintains that NetMotion's activities are part of a general business plan to solicit business in Delaware.

The Delaware Supreme Court has interpreted § 3104(c)(1) as a specific jurisdiction provision that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d at 768. Section 3104(c)(4) is a general jurisdiction provision that allows the defendants contacts with the forum state to be unrelated to the cause of action. The Federal Circuit has found that when a defendant has " purposefully shipped the accused [product] into [the forum state] through an established distribution channel [n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed.Cir.1994).

The record reflects that NetMotion made trial versions of products available on its web site for downloading by consumers located anywhere. There is no evidence of any restrictions on location of the download. NetMotion likewise placed its products into the stream of commerce by allowing Hewlett-Packard to include marketing information about NetMotion with a link to a free trial version of its software and a link NetMotion couches the relationship with Hewlett-Packward as one-sided, i.e., " Hewlett-Packward chose to include product information" , the court interprets this as a mutually beneficial agreement.

The Third Circuit Court of Appeals recently explored the contacts necessary for a court to have specific jurisdiction over a defendant based on the operation of a web site. *Toys " R" Us, Inc., v. Step Two, S.A.,* 318 F.3d 446 (3d Cir.2003). In so doing, the Court acknowledged the traditional jurisdictional rules have to be adjusted to account for new factual scenarios created by the Internet.
Under traditional jurisdictional analysis, the exercise of specific personal jurisdiction requires that the " plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum." Beyond this basic nexus, for a finding of specific personal jurisdiction, the Due Process Clause of the Fifth Amendment requires (1) that the " defendant ha[ve] constitutionally sufficient minimum contacts with the forum," and (2) that " subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice,"

**\*5** *Id.* at 451 (citations omitted); *see also, Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.1997) (sliding scale analysis for personal jurisdictional issues in web site cases).

The Third Circuit's test is whether the defendant " intentionally and knowingly transacted business with

residents of the forum state, and had significant other contacts with the forum besides those generated by its web site." *Toys " R" Us,* 318 F.3d at 453. There, the Court considered a trademark infringement and unfair competition action filed pursuant to the Lanham Act, 15 U.S.C. § 1501 *et seq.,* and New Jersey state law. The defendant was a Spanish corporation that owns or franchises toy stores in Spain and nine other countries but none in the United States. The defendant lacked any offices, bank accounts or employees in the United States. Further, the defendant did not direct any advertising or marketing efforts in the United States. The record did reflect that some merchandise for defendant's stores was purchased in the United States. From defendant's Internet web site, consumers could make online purchases; however, the site clearly was intended for users outside of the United States. For example, the price of items was noted in Spanish pesetas and Euros and goods ordered from the site could only be shipped within Spain. The electronic newsletter could be received by anyone with the only requirement being name and email address. In reversing and remanding to the district court on the issue of jurisdictional discovery,[FN4] the Third Circuit recognized that the record was too limited to provide an " occasion to spell out the exact mix of Internet and non-Internet contacts required to support an exercise of personal jurisdiction [,instead,] [t]hat determination should be made on a case-by-case basis by assessing the ' nature and quality of the contacts." ' *Id.* at 453; (quoting *Zippo,* 952 F.Supp. at 1127). Non-Internet factors that a district court should consider are: business trips to the forum state; telephone and fax communications directed to the forum state; purchase contracts with forum state residents; contracts that apply the law of the forum state; and advertisements in local newspapers. *Toys " R" Us,* 318 F.3d at 453-454. Other relevant evidence that might support the exercise of personal jurisdiction is that the defendant purposely and knowingly conducted business in the forum state by directly targeting its web site to the state. *Id.* at 454.

> FN4. The district court denied plaintiff the opportunity to conduct jurisdictional discovery to address the defendant's motion attacking jurisdiction.

In light of this authority, the court finds that NetMotion knowingly conducted business with Delaware residents. Discovery has revealed that the Wilmington Police Department at least tried to use the free trial download of NetMotion's mobility

Not Reported in F.Supp.2d                                                                                  Page 6

Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

software. (D.I.24, Ex. G) The emails between the Wilmington Police Department reflect correspondence directed to correct problems associated with the use of the trial program in order to persuade the user to purchase the alleged infringing product. (*Id.*)

**\*6** Using a third party telemarketer, NetMotion contacted Delaware businesses to solicit business and purchases. NetMotion selected seven Delaware entities [FN5] for contact by a third party telemarketer in the summer of 2003. (D.I.24, Ex. A, pgs.61-64) Additionally, NetMotion specifically targeted Delaware health care facilities.[FN6] NetMotion also mailed promotional materials to a targeted market of public safety organizations.[FN7] The documents were mailed to provide information about the products to encourage purchase. (D.I.24, Ex. A, pgs.44-45) If NetMotion did not intend to have Delaware residents as clients, it could have specifically excluded them from tele-marketers and their direct calling list. The fact that the marketing program did not generate sales belie the fact that attempts were made in Delaware, with knowledge and purpose, to do business.

> FN5. The entities were: Dover Police Department, Industrial Affairs Division, Laurel Volunteer Fire Department, New Castle County Police Department, Newark Police-Traffic Division, Delaware State Police, Wilmington Police Department. (D.I. 24, Ex. A p. 61, Ex. K)

> FN6. Alfred I. Dupont Hospital, Bayhealth Medical Center at Kent, Beebe Medical Center, Christiana Hospital, Delaware Hospital-Chronically Ill, Delaware Psychiatric Center, Milford Memorial Hospital, Nanticoke Memorial Hospital, Riverside Health Care Center, Saint Francis Hospital, Stockley Center, and the Wilmington VA Medical Center. (D.I.24, Ex. A, p. 89, Ex. M)

> FN7. These agencies were identified as: Delaware State Police (Dover), Kent County Emergency Communications, Sussex County Emergency Medical Services, New Castle County Police Department, Wilmington Public Safety, Wilmington Police Department, Delaware State Police (Odessa), Delaware State Police (Wilmington), Newark Police Department. (D.I.24, Ex. A)

Having found jurisdiction proper under the Delaware long-arm statute, the analysis becomes whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution. *See Int'l Shoe Co. v. Washington,* 326 U.S. at 310. Due process mandates that the defendant have certain minimum contacts with the forum state to ensure that the lawsuit does not offend " traditional notions of fair play and substantial justice." *Id.* at 316. In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), the Supreme Court added the further requirement that the minimum contacts be " purposeful" contacts, noting that " even a single act can support jurisdiction" so long as it creates a " substantial connection" with the forum, in contrast to an " attenuated affiliation." *Id.* at 475 n. 18. Further, the Court has directed that courts consider: 1) whether the defendant reasonably could have anticipated being haled into the forum state's court, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-293 (1980); 2) the burden imposed on the defendant by litigating in that forum, *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102 (1987); and 3) plaintiff's interest in the forum state, *id.; see also, Provident National Bank v. California Federal Savings & Loan Assoc.,* 819 F.2d at 437 (Third Circuit held that plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction).

As discussed above, the record reflects NetMotion's web site and the marketing promotion by Hewlett-Packard enabled users to download the accused products anywhere, but importantly in Delaware. By targeting businesses in the state, NetMotion knew that its conduct and connections with Delaware were such that they reasonably should have anticipated being brought to this forum.

### V. MOTION TO TRANSFER

DSI has moved to transfer venue from this district to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a),[FN8] arguing that the declaratory judgment action there provides a more convenient forum for the litigation. Padcom counters that a plaintiff's choice of forum is the paramount consideration in determining a transfer request. *Wesley-Jessen Corp. v. Pilkington Visioncare Inc.,* 157 F.R.D. 215 (D.Del.1993). NetMotion [FN9] argues that the court should transfer the case to the United States District

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Court for the District of Washington.

> FN8. Title 28, Section § 1404(a) provides: For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

> FN9. NetMotion filed a third action in the Superior Court of the State of Washington, King County, alleging that Padcom has tortiously interfered with NetMotion's contracts and business expectancies. *NetMotion Wireless Inc. v. Padcom, Inc.,* 04-cv-622-JCC (W.D. Wa 2004). Padcom removed the matter to the United States District Court for the Western District of Washington on March 24, 2004. (*Id.,* D.I. 1) On April 27, 2004, Padcom moved to transfer to the case to the United States District Court for the District of Delaware or to stay pending resolution of the instant case. (*Id.,* D.I. 8) NetMotion has filed opposition to the transfer motion, to which Padcom has filed a reply. (*Id.,* D.I. 11, 12) On May 4, 2004, Padcom, in the instant action, moved to enjoin prosecution of the subsequently filed action in the Western District of Washington and has requested that the court schedule a Rule 16 Conference. (D.I.33)

*7 Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998). The burden of establishing the need to transfer rests with the movant " to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970), *cert. denied,* 401 U.S. 910 (1971)). " Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail" . *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R.Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* Civ. No. 01-199-SLR, 2001 WL 1617186 (D.Del.2001). Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its " ' home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993).

The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). Although emphasizing that " there is no definitive formula or list of factors to consider," *id.,* the court has identified potential factors it characterized as either private or public interest. The private interests include: (1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

*8 The court is unpersuaded that the private or public interests warrant a transfer. Both plaintiff and defendant DSI are located within close proximity to this court, in Pennsylvania and New Jersey, respectively. Although defendant NetMotion is located in Seattle, Washington, it is a company trying to conduct business on a nationwide basis, including Delaware. Therefore, consistent with the deference afforded a plaintiff's choice of forum as well as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

record established on the jurisdictional discovery issue, the court is satisfied that this litigation can be maintained without undue burden to the parties.

### VI. CONCLUSION

For the reasons stated, defendants' motion to dismiss and to transfer (D.I.9) is denied. An order consistent with this memorandum opinion shall issue.

D.Del.,2004.
Padcom, Inc. v. NetMotion Wireless, Inc.
Not Reported in F.Supp.2d, 2004 WL 1192641 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# F

**C**

Ticket Solutions, Inc. v. Banks
D.Kan.,2002.
Only the Westlaw citation is currently available.
United States District Court,D. Kansas.
TICKET SOLUTIONS, INC., Plaintiff,
v.
Dan BANKS, d/b/a Ticketsolution.Com, Defendant.
**No. CIV.A. 01-2522-CM.**

May 6, 2002.

MEMORANDUM AND ORDER Pending before the court is Plaintiff's Motion for Default Judgment (Doc. 13)
CARLOS MURGUIA, District Judge.

• Procedural Background

*1 Defendant was served with the Summons and Complaint in this matter on November 5, 2001. Defendant was given twenty (20) days in which to answer the Complaint. Defendant failed to answer the Complaint within the allotted period of time. On December 4, 2001, Plaintiff applied for entry of default against Defendant. The Clerk of the Court filed an Entry of Default pursuant to Fed.R.Civ.P. 55(a) against Defendant on December 12, 2001. Subsequently, on March 7, 2002, Plaintiff filed the pending Motion for Default Judgment, seeking the entry of default judgment against Defendant. On March 29, 2002, the court issued to Defendant an order to show cause why the court should not enter a default judgment against him. Defendant has now responded.

In his response, Defendant notes that he does not oppose an entry of judgment against him, as requested by Plaintiff. Defendant does object, however, to the assessment of any attorneys' fees against him. Plaintiff has filed a reply to Defendant's response. Following a review of all submitted filings and relevant precedent, the court grants Plaintiff's motion in part.

• Evidentiary Record

The following facts are established by the record.[FN1]

FN1. " Because the court has determined that Defendant is in default, the factual allegations of plaintiff's complaint, except those relating to the amount of damages, will be taken as true." *Beck v. Atlantic Contracting Co., Inc.,* 157 F.R.D. 61, 64 (D.Kan.1994).

1. Plaintiff Ticket Solutions, Inc. (" Ticket Solutions" ) is a corporation, organized and existing under the laws of the State of Kansas, with its principal place of business at Overland Park, Kansas.

2. Defendant Dan Banks is an individual residing in Hickory, North Carolina, doing business on the World Wide Web as TicketSolution.com.

3. Ticket Solutions is engaged in the business of providing ticketing services for concerts, theatrical performances and sporting and entertainment events through interstate commerce across the United States and offers those services in part through its Internet website ticketsolutions.com.

4. Ticket Solutions registered the mark " Ticket Solutions" (" the registered mark" ), under which Plaintiff conducts its ticket servicing activities, with the United States Trademark and Patent Office on September 26, 2000.

5. Plaintiff's registration of the aforementioned registered mark with the United States Trademark and Patent Office is in full force and effect as of the date of this Judgment, and will remain so until September 26, 2010, unless terminated earlier by law.

6. Plaintiff has expended large sums of money in advertising and promoting its services under the aforementioned registered mark and in building up public recognition and demand therefore; and over the years, Plaintiff has built up a valuable business and reputation by reason of the quality of its services, which is widely identified in the minds of the purchasing public with the Plaintiff and its registered mark.

7. In November or December of 2000, Plaintiff became aware that Defendant Banks, without the consent of Plaintiff, was infringing Plaintiff's

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

**(Cite as: Not Reported in F.Supp.2d)**

aforementioned registered mark within this judicial district by registering the Internet domain name ticketsolution.com, (the " infringing domain name" ) a domain name that is substantially similar to and a colorable imitation of Plaintiff's registered mark, and by offering said domain name for sale in interstate commerce for Banks' own profit.

**\*2** 8. Defendant further infringed Plaintiff's aforementioned registered mark within this judicial district by offering in interstate commerce in connection with the sale, offering for sale, distribution or advertising of goods and services for its own profit, Defendant's own ticketing services at his Internet website located at ticketsolution.com (the " infringing website" ), [FN2] which was substantially similar to and a colorable imitation of Plaintiff's registered mark.

> FN2. In the Affidavit Defendant submitted with his Response to Order to Show Cause, Defendant attests that there was " a ticket broker that desired to use the domain name ' ticketsolution.com' for its web site offering its ticket brokering services [that] contacted [Defendant]. [Defendant] agreed to allow the ticket broker to use the domain name ' ticketsolution.com' and change the technical contact for that domain name to the ticket broker's server ... The ticket broker agreed to pay [Defendant] an amount based upon the success of its website for use of the domain name." (Def.'s Aff. at ¶ 4) Defendant further attests that he has received " no payment from the ticket broker." (*Id.*)

9. Defendant intentionally used the aforementioned infringing domain name and website in a manner that caused confusion, mistake and deceived the purchasing public as to the affiliation, connection or association of its website and the goods and services offered therein with the goods and services of Plaintiff, or caused confusion, mistake or deceived the purchasing public as to the origin, sponsorship, or approval of Defendant's website and the goods and services offered therein by Plaintiff.

10. Defendant used the aforementioned infringing domain name and website in interstate commercial advertising or promotion in such a way as to misrepresent the nature, characteristics, qualities or geographical origin of its goods and services.

11. The unauthorized and infringing use by Defendant of Plaintiff's registered mark caused irreparable harm, damage and injury to Plaintiff in that the interstate sale and marketing of the Defendant's services under the infringing mark confused customers and diminished the value of Plaintiff's ticketing services.

12. Counsel for Ticket Solutions contacted Defendant on or about October 1, 2001 to demand that Defendant cease and desist from using the name ticketsolution.com. Defendant refused to cease and desist from using the name, indicated his intent to continue doing business through the *ticketsolution.com* website, and offered to entertain a bid from Ticket Solutions for purchase of the domain name.

13. Ticket Solutions does business in part through its own website *ticketsolutions.com.*

14. Since the filing of the lawsuit, Dan Banks has taken his website down but continues to own the infringing domain name ticketsolution.com and may recommence marketing activities under that domain name at any time.[FN3]

> FN3. In the Affidavit Defendant submitted with his Response to Order to Show Cause, Defendant attests that he does " not intend to renew" the registration of the domain name " ticketsolution.com," which is set to expire on June 1, 2002. (Def.'s Aff. at ¶ 2)

• Legal Standard

Federal Rule of Civil Procedure 55(b) provides that a party shall apply to the Court for a judgment of default upon the entry of default pursuant to Fed.R.Civ.P. 55(a) by the clerk. Plaintiff has filed its Motion for Default Judgment and it is that motion which is currently before the Court for determination.

When considering a motion for default judgment, the Court must first determine that plaintiff has made a prima facie showing of the Court's personal jurisdiction over the defaulting party. *Dennis Garberg & Assoc. v. Pack-Tech Int'l Corp.,* 115 F.3d 767, 772-73 (D .Kan.1997). While the Court may hold a hearing to make this determination, it is not necessary to do so if the plaintiff's entitlement to relief is evident from the record. *Hamstein Music Co. v. Bait Shack, Inc.,* 2001 WL 709402, \*2 (D.Kan.2001).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4

Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

**(Cite as: Not Reported in F.Supp.2d)**

\*3 After prima facie evidence of the Court's personal jurisdiction is determined, the Court must turn its attention to the plaintiff's entitlement to the relief it seeks. Fed.R.Civ.P. 55(b).

• Discussion

• Personal Jurisdiction

Plaintiff has established this Court's personal jurisdiction over Defendant because the evidence in the record establishes that Defendant had sufficient minimum contacts with the State of Kansas to confer jurisdiction upon Kansas courts.

Kansas Courts determine whether they have personal jurisdiction over a party by examining (1) whether the Court has jurisdiction over the party under the Kansas long-arm statute, and, if so, (2) whether the party in question has sufficient minimum contacts with the state to comport with the protections of constitutional due process. Dennis Garberg, 115 F.3d at 773. In actuality, the two elements merge into the latter one because Kansas' long arm statute allows Kansas courts to assert personal jurisdiction to the full extent permitted by the due process clause. Hodgdon Powder Co., Inc. v. Clean Shot Techs., Inc., 92 F.Supp.2d 1170, 1173, (D.Kan.2000). Kansas courts have previously recognized that where a defendant conducts business over the Internet soliciting contracts with residents of Kansas, personal jurisdiction is proper. 2000 Int'l Ltd. v. Chambers, 2000 WL 1801835, *5 (D.Kan.2000).

The evidence in the record shows that Defendant Banks solicited contracts over the Internet with a Kansas resident when he sent Plaintiff Ticket Solutions an e-mail message offering to sell Ticket Solutions the domain name *www.ticketsolution.com,* which Banks owned. The record further shows that Defendant Banks offered ticketing services over the Internet, which services could be and were accessed by Kansas residents.

Because the record shows that Defendant Banks solicited business over the Internet from Kansas residents, it is established that Banks had sufficient minimum contacts with Kansas to confer personal jurisdiction over Banks upon this Court. Thus, the Court must now proceed to determine whether Plaintiff has also produced evidence establishing that it is entitled to the relief it seeks.

• Plaintiff's Entitlement to the Relief It Seeks.

Plaintiff's Complaint presents three claims for relief. The first is a claim for trademark infringement under 15 U.S.C. § 1114(1)(a). Plaintiff's second claim is dilution of Plaintiff's registered mark under 15 U.S.C. § 1125(a). Plaintiff's final claim is for cyberpiracy of its registered mark under 15 U.S.C. § 1125(d)(1)(A). The evidentiary record establishes Plaintiff's entitlement to relief on all of its claims.

• The § 1114(1)(a) Trademark Infringement Claim.

The record shows that Plaintiff is entitled to relief on its claim under 15 U.S.C. § 1114(1)(a). Consequently, a judgment of default will be entered against Defendant Banks on Plaintiff's § 1114(1)(a) claim.

The prima facie elements of a claim under § 1114(1)(a) are: 1) use in commerce of any reproduction, counterfeit, copy or colorable imitation of a registered mark; 2) in connection with the sale, offering for sale, distribution, or advertising of any goods or services; 3) which is likely to cause confusion, or to cause mistake or to deceive. 15 U.S.C. § 1114(a)(1).

\*4 The evidence in the record establishes that Banks sold ticketing services on the Internet under the name ticketsolution.com which is virtually identical to Plaintiff's validly and duly registered mark " Ticket Solutions." Thus, Banks used a colorable imitation of a registered mark, in connection with the sale of goods or services. The evidence further establishes that Defendant's actions confused the purchasing public, members of which called Plaintiff on numerous occasions seeking customer service for products they had actually purchased from Banks.

The evidence establishes all of the prima facie elements of Plaintiff's claim under § 1114(a)(1). Consequently, the Court will enter a judgment of default against Defendant Banks on this claim.

With regard to relief, statutory language provides that Plaintiff may recover injunctive relief in addition to the payment of any damages it sustained, the costs of the action determining the violation, and the amount of the defendant's profits accrued by reason of the violation. 15 U.S.C. §§ 1114, 1117.

While plaintiff's Complaint seeks all of the relief allowed by the statutes, plaintiff's Motion for Default

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

(Cite as: Not Reported in F.Supp.2d)

Judgment limits its request to an order 1) enjoining Banks from any further use of the domain name ticketsolution.com; 2) transferring the domain name ticketsolution.com to plaintiff; 3) directing Banks to turn over all articles infringing Plaintiff's registered mark to Plaintiff; and 4) directing Banks to pay Plaintiff's costs and attorneys' fees in the amount of $5,916.96.

The court finds plaintiff has proven entitlement to all relief requested, except the request for attorneys' fees. Although § 1117(a) provides that where a violation is established " the plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," the statute provides no similar entitlement to attorneys' fees. Instead, § 1117(a) provides that the court " in exceptional cases may award reasonable attorney fees to the prevailing party." Id. § 1117(a) (emphasis added).

Exceptional circumstances exist where the trademark infringement at issue " can be characterized as malicious, fraudulent, deliberate, or willful." Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1224 (10th Cir.1998) (internal quotations omitted), cert denied, 122 S.Ct. 1069 (2002). Considering the record before the court, the court finds no exceptional circumstances are present justifying an award of attorneys' fees. Plaintiff's motion is denied on this basis.

Accordingly, the relief requested by Plaintiff (absent an award of attorneys' fees) shall be granted. Plaintiff's motion is granted on this basis.

• The § 1125(a) Dilution of Registered Mark Claim.

The record shows that Plaintiff is also entitled to relief on its claim under 15 U.S.C. § 1125(a). Consequently, a judgment of default will be entered against Defendant Banks on Plaintiff's § 1125(a) claim as well.

*5 The prima facie elements of a claim under § 1125(a) are: 1) use in connection with any goods or services of any word, term, name, symbol, device, or any combination thereof; 2) which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with plaintiff, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by plaintiff; and 3) which has caused or is likely to cause damage to plaintiff. See 15 U.S.C. § 1125(a).

Again, the evidence in the record establishes that Banks sold ticketing services on the Internet under the name ticketsolution.com which is virtually identical to Plaintiff's validly and duly registered mark " Ticket Solutions." Thus, Banks used a colorable imitation of Plaintiff's registered mark, in connection with the sale of goods or services. The evidence further establishes that Defendant Banks' actions confused the purchasing public, members of which called Plaintiff on numerous occasions seeking customer service for products they had actually purchased from Banks.

The evidence establishes all of the prima facie elements of Plaintiff's claim under § 1125(a). Consequently, the Court will enter a judgment of default against Defendant Banks on this claim.

Again, with regard to damages, statutory language provides that Plaintiff may recover injunctive relief plus payment of any damages it sustained, the costs of the legal action determining the violation, and the amount of the defendant's profits accrued by reason of the violation. 15 U.S.C. §§ 1114, 1117, 1125(a).

While Plaintiff's Complaint seeks all of the relief allowed by the statutes, Plaintiff's Motion for Default Judgment limits its request to an order 1) enjoining Banks from any further use of the domain name ticketsolution.com; 2) transferring the domain name ticketsolution.com to Plaintiff; 3) directing Banks to pay Plaintiff's costs and attorneys' fees in the amount of $5,916.96; and 4) directing Banks to turn over all articles infringing Plaintiff's registered mark to Plaintiff.

Again, the court finds plaintiff has proven entitlement to all relief requested, except the request for attorneys' fees. As noted above, to justify an award of attorneys' fees, plaintiff must show " exceptional circumstances" exist. 15 U.S.C. § 1117(a). Considering the record before the court, the court finds no exceptional circumstances are present justifying an award of attorneys' fees. SeeBishop, 154 F.3d at 1224 (noting exceptional circumstances exist where the trademark infringement at issue " can be characterized as malicious, fraudulent, deliberate, or willful" ). Plaintiff's motion is denied on this basis.

Accordingly, the relief requested by Plaintiff (absent an award of attorneys' fees) shall be granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6

Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff's motion is granted on this basis.

• The § 1125(d)(1)(A) Cyberpiracy Claim.

The record shows that Plaintiff is also entitled to relief on its claim under 15 U.S.C. § 1125(d)(1)(A). Consequently, a judgment of default will be entered against Defendant Banks on Plaintiff's § 1125(d)(1)(A) claim as well.

**\*6** The prima facie elements of a claim under § 1125(d)(1)(A) are: 1) registration, trafficking in or use of a domain name; 2) which is confusingly similar to a distinctive mark, or which is a trademark, word or name at the time of registration of the domain name; 3) with bad faith intent to profit from that mark. *See* 15 U.S.C. § 1125(d)(1)(A). Bad faith intent is evidenced by, among other things: 1) the presence of plaintiff's trademark name in the domain name; 2) the person's offer sell the domain name to the mark owner for financial gain without having used the domain name in the bona fide offering of any goods or services; and 3) the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site. 15 U.S.C. § 1125(d)(1)(B).

The evidence in the record establishes that Banks registered the domain name ticketsolution.com which is virtually identical to Plaintiff's validly and duly registered mark " Ticket Solutions." The evidence further establishes that Defendant's actions confused the purchasing public, members of which called Plaintiff on numerous occasions seeking customer service for products they had actually purchased from Banks. Finally, the evidence establishes Banks' bad faith because it shows he offered to sell the domain name to Ticket Solutions for profit before he had engaged in the bona fide offering of any goods or services under the name, and that he intended to profit from the confusion created by the similarity of his website's name to that of Ticket Solutions' after Ticket Solutions refused to purchase the domain name from Banks.

The evidence establishes all of the prima facie elements of Plaintiff's claim under § 1125(d)(1)(A). Consequently, the Court will enter a judgment of default against Defendant Banks on this claim.

Again, with regard to damages, statutory language provides that Plaintiff may recover injunctive relief plus payment of any damages it sustained, the costs of the legal action determining the violation, and the amount of the defendant's profits accrued by reason of the violation. 15 U.S.C. § 1125(d)(1)(A).

While Plaintiff's Complaint seeks all of the relief allowed by the statutes, Plaintiff's Motion for Default Judgment limits its request to an order 1) enjoining Banks from any further use of the domain name ticketsolution.com; 2) transferring the domain name ticketsolution.com to Plaintiff; 3) directing Banks to pay Plaintiff's costs and attorneys' fees in the amount of $5,916.96; and 4) directing Banks to turn over all articles infringing Plaintiff's registered mark to Plaintiff.

Again, the court finds plaintiff has proven entitlement to all relief requested, except the request for attorneys' fees. As noted above, to justify an award of attorneys' fees, plaintiff must show " exceptional circumstances" exist. 15 U.S.C. § 1117(a). Considering the record before the court, the court finds no exceptional circumstances are present justifying an award of attorneys' fees. *SeeBishop*, 154 F.3d at 1224 (noting exceptional circumstances exist where the trademark infringement at issue " can be characterized as malicious, fraudulent, deliberate, or willful" ).[FN4] Plaintiff's motion is denied on this basis.

> FN4. The court notes that the " finding" of bad faith made with respect to plaintiff's § 1125(d)(1)(A) cyberpiracy claim is mandated based upon the allegations in plaintiff's complaint. Where a defendant is found to be in default, " the factual allegations of plaintiff's complaint ... will be taken as true." *Beck*, 157 F.R.D. at 64 (emphasis added). In contrast, a plaintiff's allegation of damages is specifically exempted from this default rule. The *Beck* court specified that upon a finding of default, " the factual allegations of plaintiff's complaint, except those relating to the amount of damages, will be taken as true." *Id* (emphasis added). Recognizing this distinction, the court does not find an inconsistency in its denial of attorneys' fees, even in light of its granting of default judgment on plaintiff's § 1125(d)(1)(A) cyberpiracy claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

**(Cite as: Not Reported in F.Supp.2d)**

*7 Accordingly, the relief requested by Plaintiff (absent an award of attorneys' fees) shall be granted. Plaintiff's motion is granted on this basis.

• Order

IT IS HEREBY ORDERED THAT Plaintiff's Motion for Default Judgment (Doc. 13) is granted in part.

IT IS FURTHER ORDERED THAT default judgment shall be entered against Defendant Banks on all claims against him in Plaintiff's Complaint.

IT IS FURTHER ORDERED THAT Defendant and all those holding with, through, or under Defendant, or acting on his behalf, be enjoined from infringing on Plaintiff's registered mark in any way, including but not limited to, doing business in any manner under the infringing domain name of Ticketsolution.com.

IT IS FURTHER ORDERED THAT Defendant and all those holding with, through, or under Defendant, or acting on his behalf be ordered to transfer the infringing domain name of Ticketsolution.com to Plaintiff.

IT IS FURTHER ORDERED THAT Defendant and all those holding with, through, or under Defendant or acting on his behalf, be ordered to deliver all articles alleged to infringe Plaintiff's registered mark " Ticket Solutions" to Plaintiff.

IT IS FURTHER ORDERED THAT Defendant be ordered to pay Plaintiff's costs incurred in bringing this action. Plaintiff shall, within 20 days of the date of this order, submit an accounting of the costs associated with the present action to the court for approval. Upon approval, the court will issue an order assessing the amount of costs approved against defendant.

IT IS SO ORDERED. Dated this day of May 2002, at Kansas City, Kansas.

D.Kan.,2002.
Ticket Solutions, Inc. v. Banks
Not Reported in F.Supp.2d, 2002 WL 989462 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of June, 2007, the attached PLAINTIFFS'
REPLY BRIEF IN RESPONSE TO DEFENDANTS' ANSWERING BRIEF
OPPOSING PLAINTIFF'S MOTION TO ENLARGE BRIEFING SCHEDULE TO
PERMIT JURISDICTIONAL DISCOVERY was served upon the below-named counsel
of record at the address via hand delivery and e-mail:

> Julia Heaney
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347
>
> Richard D. Kirk
> Ashley B. Stitzer
> The Bayard Firm
> 222 Delaware Avenue, Suite 900
> P.O. Box 25130
> Wilmington, DE 19899-5130

> /s/ Francis DiGiovanni
> Francis DiGiovanni (#3189)